2022 IL App (1st) 220017

SIXTH DIVISION
July 29, 2022

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-22-0017

| | | |
|---|---|---|
| *In re* M.D., a Minor, | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 JA 572 |
| | ) | |
| Melvin D. and Sha'bora J. | ) | Honorable |
| | ) | Demetrios Kottaras, |
| Respondents | ) | Judge Presiding. |
| | ) | |
| (Melvin D., Respondent-Appellant)). | ) | |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Oden Johnson and Mitchell concurred in the judgment and opinion.

**OPINION**

¶ 1     This case stems from a petition of wardship filed by the State alleging that M.D., a three-month-old infant, had been diagnosed with failure to thrive and had bruising on his back, arm, and face that medical professionals believed was the result of nonaccidental trauma. The State sought findings, pursuant to sections 2-3 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2018)), that M.D. was both neglected due to an injurious environment and abused.

¶ 2     Following a lengthy adjudicatory hearing in which conflicting expert testimony was presented, the trial court initially dismissed the petition, concluding that the State had failed to

prove by a preponderance of the evidence that M.D. had been either neglected or abused. The court noted that the evidence supporting a finding that the marks on M. D. were bruises was controverted and that the marks simply could not be "definitively explained." Following an emergency motion to reconsider filed by the public guardian, the court was prompted to "re-review" the evidence and this time concluded that it did warrant a finding of neglect due to an injurious environment.

¶ 3    M.D.'s father, Melvin D., argues on appeal both that there was no valid basis on which to grant the motion to reconsider and that the court's finding of neglect was against the manifest weight of the evidence. M.D.'s mother Sha'bora J. is not a party to this appeal.

¶ 4    For the reasons that follow, we agree with Melvin that, on this record, a finding of neglect was against the manifest weight of the evidence. We reverse the trial court's order granting the public guardian's motion to reconsider and reinstate its order dismissing the State's petition for wardship.

¶ 5                                    I. BACKGROUND

¶ 6                          A. The State's Petition for Wardship

¶ 7    On May 30, 2019, the State petitioned the trial court to adjudge M.D., a three-month-old baby boy, a ward of the state. The State argued that M.D. was neglected, pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2018)), because he resided in an environment that was injurious to his welfare and that he was abused, pursuant to sections 2-3(2)(i) and (ii) of the Act (705 ILCS 405/2-3(2)(i), (ii) (West 2018)), because physical injuries had been inflicted on him by other than accidental means and there was a substantial risk of such injuries in the future. The allegations supporting these requested findings were as follows:

"On or about May 20, 2019, this minor was hospitalized and observed to have multiple bruises, including patterned bruising on his back. Parents have no explanation as

to how this minor was injured. Medical personnel opine that minor's injuries are the result of non-accidental trauma. Mother reported additional history concerning previous injuries, including a subconjunctival hemorrhage in April of 2019 and facial bruising to his cheeks. Minor has been diagnosed with non-organic failure to thrive. Parents reside together."

¶ 8 An affidavit detailing efforts taken thus far by the Department of Child and Family Services (DCFS) stated that a physician specializing in child abuse and neglect had determined that the marks on M.D.'s back "were likely sustained from non-accidental trauma." These were, according to the DCFS investigator, "serious unexplained *** injuries" for a child of this age. The court concluded that probable cause existed for a finding of abuse or neglect, and M.D. was removed from his parents' home and placed in the temporary custody of DCFS.

¶ 9                                    B. The Adjudicatory Hearing

¶ 10 An adjudicatory hearing was held over six days in the spring and summer of 2021. Because this appeal turns on the sufficiency of the evidence to show abuse or neglect at that hearing, we discuss it in some detail.

¶ 11                                    *1. The State's Witnesses*

¶ 12                                    a. Dr. Helen Tewelde

¶ 13 The State first called Dr. Helen Tewelde, a board-certified pediatrician employed by Lawndale Christian Health Center. Dr. Tewelde testified that she graduated from medical school in 2009 and completed her residency in pediatric medicine at the Cleveland Clinic in 2012. Dr. Tewelde acknowledged that she was not a specialist in child abuse pediatrics. In her years of practice, there had been 10 to 20 other cases in which she suspected child abuse or neglect. Of these, only "five to ten" involved marks or bruises and "five to seven" failure to thrive or poor weight gain. No objections were raised to Dr. Tewelde testifying as an expert in pediatric medicine.

¶ 14    Dr. Tewelde testified that M.D. was her patient, that she first saw him on February 25, 2019, a few days after he was born, and that he appeared to be doing well at that time. She saw M.D. again on March 5, 2019, when he was 11 days old, and was concerned because he had lost weight since the last time she saw him. Dr. Tewelde explained that although it can be normal for a newborn to lose weight at first, she typically sees that with breast-fed babies, and M.D. was fed formula. Even for babies who lose weight initially, once birth weight has been regained, she expects to see a steady increase of about one ounce per day during the first three months. Dr. Tewelde decided to have M.D.'s parents bring him in for more frequent checkups, about once a week for his first month, so that his weight could be closely monitored. She discussed with M.D.'s mother, Sha'bora, M.D.'s feeding schedule, how much formula he was getting at each feeding, and the proper ratio of water to formula. Dr. Tewelde also made a note in M.D.'s record at that time that it was "[u]nclear if different scales [were] contributing to [the] difference as well."

¶ 15    When Dr. Tewelde saw M.D. again, on March 12, he had gained some weight but only about half of the one ounce per day that she had hoped he would gain. She suggested that Sha'bora set an alarm to feed him every two hours during the day and increase the amount of formula at each feeding. This seemed to be effective. Between March 12 and March 19, 2019, M.D. gained over one ounce per day. When he returned on April 3, 2019, however, he had only gained another five ounces. At this visit, Sha'bora told Dr. Tewelde that she had switched M.D. to a different type of formula because he had been spitting up. By April 15, 2019, M.D. was back to gaining one ounce per day, which he continued to do until April 22. Between April 22 and May 20, 2019, he was just shy of this target, gaining slightly less than one ounce per day.

¶ 16    Dr. Tewelde testified that although M.D. was making "steady improvements," she was still concerned about the inconsistency of his weight gain over time. Her notes for his visit on April 15,

2019, state, "[g]ood weight gain of 1 lb in the last 1.5 weeks. Has gained an average of 1.3oz/day (above the expected 1oz/day) Will still check FTT labs." Because the failure-to-thrive lab work she ordered came back positive for an elevated ammonia level, which can indicate a metabolic disorder, Dr. Tewelde referred M.D. to the genetics lab at Lurie Children's Hospital. M.D. missed three appointments before being seen there. A case manager spoke to Sha'bora to help her secure transportation, and M.D. was seen at the genetics lab on May 1, 2019. The lab ultimately concluded that it was unlikely he had a metabolic disorder.

¶ 17    On April 22, 2019, Dr. Tewelde learned that M.D.'s parents were using a Fisher-Price® Rock 'n Play™ sleeper. She informed Sha'bora that the product had been recalled and should not be used. At that time, Dr. Tewelde also noticed a small subconjunctival hemorrhage (a burst blood vessel) in M.D.'s right eye. Seeing no other signs on the exam that were concerning, however, she "decided not to pursue any further evaluation." She did not notice any marks on M.D.'s back, arms, or face at that time. Dr. Tewelde's notes from that visit question whether the burst blood vessel had in fact been "present from birth." Dr. Tewelde testified that, although she sometimes sees babies with burst blood vessels in their eyes following the pressure of a vaginal delivery, she found the condition unusual in a two-month old with no history of forceful vomiting. At the adjudicatory hearing, she maintained that the condition could not be caused by "just simple crying."

¶ 18    M.D. was due for his next visit with Dr. Tewelde on April 29, 2019, but his parents had to reschedule several times and did not bring him in again until May 20, 2019. They reported that he had been "spitting up a little" and was "intermittently fussy over the last week." M.D.'s parents did not alert Dr. Tewelde to any marks or bruises. Upon examining, M.D., however, she observed "approximately eight green-like lesions over his back." She described these as greenish-blue and interconnected, with "a cluster of rings on the left side" and "a little bit on the right side as well."

5

Dr. Tewelde also observed "a very faint non-discreet green patch on his forehead" and a three centimeter by two centimeter "fading green bruise" on his arm.

¶ 19    Dr. Tewelde asked M.D.'s parents about the marks and, according to her, Sha'bora said she had noticed them a day or two prior and "thought they were Mongolian Spots." Dr. Tewelde told Sha'bora that the marks were not consistent with that condition, which is present from birth and does not "suddenly appear." Dr. Tewelde also testified that the "ring-like appearance where it's clear in the middle" was unlike Mongolian spots, which "would be fully filled in with a bluish color." Melvin had no explanation for the marks and, from his reaction when they were pointed out to him, "seemed kind of taken aback."

¶ 20    Dr. Tewelde was concerned about the marks because, as she explained, "any bruising noted in a child less than six month's old, who is not able developmentally to move around on their own, to be able to crawl is concerning for possible physical abuse." Dr. Tewelde called DCFS to investigate the bruising on M.D.'s back. She told the family they could stay at her office, but they elected to take M.D. home and wait for DCFS there.

¶ 21    Dr. Tewelde said that she believed M.D.'s parents followed the advice she gave them regarding his feeding. She agreed that they were open with her, were engaged in her assessment of M.D., asked questions, and followed up on appointments. Because there was improvement over time, she never felt it was necessary to refer M.D. to a nutritionist. She explored possible medical causes but was never able to conclude what had caused M.D.'s poor weight gain.

¶ 22    Dr. Tewelde agreed that when she saw M.D. on February 25, March 5, March 12, and April 3, and April 15, she noted each time that she had physically examined him, and he was "well-appearing" and "under no acute distress. She believed the marks on M.D.'s back were bruises, and she did not consider referring him to a pediatric dermatologist. She did not diagnose M.D. as being

abused, but that "was [her] suspicion."

¶ 23                              b. DCFS Investigator Aracely Madrigal

¶ 24    Aracely Madrigal, the DCFS investigator assigned to check on M.D.'s safety and well-being, visited the family's home on May 20, 2019. Because it was after hours, Ms. Madrigal arrived with a police escort. At the home were M.D.'s mother, his father, his adoptive aunt, his adoptive cousin, as well as an unknown adult male who was the aunt's guest. Sha'bora explained to Ms. Madrigal that her adoptive mother was deceased, that she lived with her adoptive sister, Sharon, and Sharon's 13-year-old son Arnell. M.D.'s primary caregivers were his parents, Sharon, and his paternal grandmother. Sha'bora did not work or go to school and was rarely apart from M.D. When Ms. Madrigal arrived at the home, M.D. was being held. He was not crying and did not appear to be in any pain.

¶ 25    The family was cooperative, so Ms. Madrigal told the police they could leave. She spoke to M.D.'s parents alone in the living room. When asked what had caused the marks on M.D.'s back, both parents said they did not know. They told her that nothing had happened to M.D. and that there had been no accident that they were aware of that could have caused the marks on his back. Melvin speculated that when the baby was put in the Rock 'n Play sleeper, the circular plastic rings attached to it could have left an impression on his skin. Melvin showed Ms. Madrigal the rings on the Rock 'n Play. When asked if she was able to "rule out" those rings as having caused the marks on M.D.'s back, Ms. Madrigal said, "I don't know how that would—I just I couldn't see that—unless you were pressing—I just—I don't—it didn't make sense, but I don't know."

¶ 26    When she asked them if they had noticed marks on M.D.'s body before, Sha'bora said a few days earlier she had noticed a mark on his forehead that Melvin thought was a blemish and the previous month she had noticed a mark on his cheek that she thought might be a Mongolian

spot. Ms. Madrigal could not remember if there was a spot on M.D.'s cheek when she visited the family on May 20.

¶ 27    Ms. Madrigal testified that M.D.'s parents were "very cooperative" and "very engaged" at all times, even when she explained to them that M.D. would be evaluated for abuse at the hospital. Nothing they did or said raised any red flags with her. They helped her document the marks on his back by holding him while she took photographs, and those photographs were introduced into the record. They allowed Ms. Madrigal to help them transport M.D. to Stroger Hospital and agreed to a safety plan—which ultimately became unnecessary when M.D. was admitted to the hospital— whereby M.D. would stay with Melvin's mother while DCFS completed its investigation.

¶ 28    M.D.'s aunt, Sharon, was also cooperative and friendly at first but, according to Ms. Madrigal, "her demeanor changed" when the police left. She insisted that the baby was safe, no one had done anything to the baby, and there was no need for a medical evaluation. Ms. Madrigal asked who the man she had observed in the home was and Sharon would not say.

¶ 29    Ms. Madrigal was very concerned when she saw the marks on M.D.'s back because her training has taught her that young infants who are not "cruising" should not have bruises. Ms. Madrigal testified that she was very familiar with the condition known as Mongolian spots, from personal experience and from her 10 years working with children. She found both M.D.'s small size and the "unexplained bruises" on his back concerning, "whether someone caused them" or whether, through a "lack of supervision" he was able to obtain them.

¶ 30    On the way to the hospital, Ms. Madrigal asked Sha'bora if she had any idea who could have hurt M.D., and Sha'bora said that, if she had to guess, maybe it was her sister. She did not elaborate, and Ms. Madrigal did not follow up. Sha'bora was adamant that she had not hurt M.D.

¶ 31    In a private interview with Sharon's son Arnell, Ms. Madrigal asked him "about discipline

of all children" in the home and he told her "the baby's discipline was to be put in his crib." When the court inquired what so young a baby could do that would necessitate discipline, Ms. Madrigal apologized, stating that she should have asked that follow-up question but had not done so. On cross-examination, Ms. Madrigal acknowledged that Arnell said that he was not afraid of anything in the home and that no one hit the baby. Arnell himself showed no signs of abuse or neglect.

¶ 32    Ms. Madrigal agreed on cross-examination that Dr. Tewelde had told her that a popped blood vessel that had been observed in M.D.'s eye sometime prior was "incidental" and could simply be from crying. On redirect, however, she acknowledged that Dr. Tewelde also said it could be consistent with abuse.

¶ 33    Ms. Madrigal was not able to conclude whether the marks on M.D.'s back were caused by abuse or neglect. She said that was for the hospital to determine.

¶ 34                                    c. Dr. Annie Torres

¶ 35    Dr. Annie Torres testified that she was licensed to practice medicine in 2014. She completed a three-year fellowship in child abuse pediatrics at Stroger Hospital in 2017 and was an attending physician there until early 2021, when she took a position at Lurie Children's Hospital. Dr. Torres is board-certified in pediatrics and is board-eligible in child abuse pediatrics; she had met all of the requirements to sit for the exam but, at the time of her testimony, testing was suspended due the COVID-19 pandemic. The court found Dr. Torres qualified to testify as an expert in both pediatrics and child abuse pediatrics.

¶ 36    Dr. Torres was part of Stroger Hospital's consulting service. Other doctors would consult with her in cases where child abuse or neglect were suspected. This is what she spent 100% of her time doing. Dr. Torres estimated that she and her team concluded there was no abuse or neglect in over half of the cases they were consulted on.

¶ 37    M.D. was referred to Dr. Torres for a consultation on May 21, 2019, "due to concerns for bruising" and because of his "previous history of failure to thrive." Dr. Torres reviewed M.D.'s medical records, examined him, and spoke to Sha'bora about his medical history and their living situation. Sha'bora told her that she first noticed the marks on M.D.'s back at the pediatrician's office the day before, "was not sure what they were," and "was interested in completing the hospitalization to learn what they could be from." Dr. Torres noted, however, that M.D.'s hospital records included a note from a nurse stating that when M.D. was triaged, Sha'bora stated she had noticed the lesions the day before the pediatrician visit "and had put cream on them."

¶ 38    Dr. Torres testified that when asked if she had ever noticed any other injuries or marks on M.D. in the past, Sha'bora said she had noticed a mark between his eyes about a week prior but that it had started to "fade a little bit since then." According to Dr. Torres, at some point Sha'bora also "talked about seeing similar *** ring-like bluish lesions on his cheek." She additionally reported that he had a "popped a blood vessel in his eye one night" and that "[f]irst it was in one eye, then it was the second eye." Dr. Torres included this information in her notes because it could be indicative of "either potential traumatic injuries or a potential bleeding condition." Subsequent lab work, however, ruled out a bleeding condition.

¶ 39    Dr. Torres physically examined M.D., noting "several cutaneous findings" on his face, back, and the back of his right upper arm. Serial examinations were performed during M.D.'s hospitalization from May 21 to May 29, 2019, and Dr. Torres saw him again at an outpatient clinic on June 6, 2019. Dr. Torres described the marks on M.D.'s back as "several greenish blue lesions *** in a somewhat ring-like fashion with central sparing" and "a little bit of purplish discoloration in some areas." She also observed a "bluish gray macule [flat discolored area of skin] overlying his sacrum [tailbone]" that "was consistent with dermal melanocytosis" (a condition sometimes

10

referred to as "Mongolian spots") and a birthmark on his right buttock, which was "more brown in color." Based on "the clinical appearance, their gradual resolution over the hospital stay, and the history provided by the family," she determined that the ring-like marks were bruises. Looking at photographs of M.D. on May 21, May 24, and June 6, she noted that the marks "changed color, and most of them faded or almost completely resolved" during his hospital stay, while the dermal melanocytosis on his sacrum "remained the same and stable." According to Dr. Torres, the mark on M.D.'s forehead and the suspected bruise on the back of his arm also faded over time.

¶ 40  The Rock 'n Play sleeper was brought to the hospital, and Dr. Torres examined and photographed it. It had a large white ring with three small rings attached to it that were meant to be placed over the baby to give the baby something to play with. Sha'bora told Dr. Torres, however, that M.D. "wouldn't necessarily be buckled in" to the sleeper. Instead, "she would lay him in there gently" on top of the rings. They had been using the Rock 'n Play in this fashion every day for about two months, and most recently on May 20, the day before his appointment with Dr. Tewelde. Dr. Torres had Sha'bora demonstrate this and took a photograph of M.D. in the sleeper with the rings underneath him. According to her, the rings were "mostly behind his neck and his skull." Sha'bora said she sometimes placed M.D. higher up in the sleeper, but when she tried to show this to Dr. Torres, M.D. "would kind of slide back down." Dr. Torres acknowledged that she could not be sure of M.D.'s placement in the sleeper when he was at home, but when he was placed in it at the hospital, the location of the rings did not correspond with the location of the bruises on his back. Dr. Torres also measured the rings and found that the large ring was six centimeters in diameter and the smaller rings were four centimeters in diameter. The lesions on M.D.'s back were smaller, approximately two centimeters in diameter.

¶ 41  When asked if Sha'bora was forthcoming with information and interested in M.D.'s

welfare, Dr. Torres said, "[y]es, very. She was very engaged throughout the whole hospitalization," asked appropriate questions, was "open and interested in learning about the best care for her son," and even sought out "additional conversations" with Dr. Torres about M.D.'s care. Sha'bora herself raised the possibility of abusive injury when she first spoke with Dr. Torres because, as she had explained to the pediatrician, "she felt that she didn't know of anybody that had hurt the baby" and understood that "this would not be the time to be quiet."

¶ 42    Dr. Torres recalled that "[t]he initial opinion" from the dermatology department at Stroger Hospital was that the marks on M.D.'s back were dermal melanocytosis (Mongolian spots). The dermatologist then "re-evaluated [M.D.] later in the hospitalization," and Dr. Torres telephoned the dermatologist "after that date" to understand the basis for the opinion. In her view, the marks could not be dermal melanocytosis because that is a condition that is present from birth and does not suddenly disappear. When Dr. Torres asked the dermatologist about the lesions that had resolved or changed in color, the dermatologist told her "that she didn't necessarily see those lesions." The dermatologist also had not noticed a mark on M.D.'s forehead. Dr. Torres pressed on, offering to review the photographs she had taken with the dermatologist, to ensure they were talking about the same things. At that point, the dermatologist "expressed that she was not a pediatric dermatologist, and that if the family wanted to, they could pursue further with a pediatric dermatologist."

¶ 43    Dr. Torres acknowledged on cross-examination that the dermatology department at the hospital "disagreed that [M.D.] had bruising" and "stated that they did not see any bruising." After reassessing the lesions, they "stated that they thought they were secondary to dermal melanocytosis." The dermatologist stated that she "didn't see" the lesions Dr. Torres was talking about and was not a pediatric dermatologist. She did not change her opinion about the marks but

again recommended follow-up with a pediatric dermatologist. Dr. Torres did not follow up with a pediatric dermatologist. She did not consider it part of her role as a consultant to make referrals like that. She did, however, tell M.D.'s parents that "[i]f they wanted further evaluation by the dermatologist, they should follow up at a pediatric dermatologist."

¶ 44    The documentary evidence confirms this exchange between Dr. Torres and the dermatology department. Records indicate that M.D. was referred to resident physician Dr. Sook Hwang and attending physician Dr. Kubinne Kim in Stroger's dermatology department. He was examined by Dr. Hwang on May 21, 2019, who observed at that time "annular [ring-shaped] to branching uniformly bluish gray patches over [M.D.'s] upper and middle back," "lacy reticulated [netlike] purplish patches" over M.D.'s thighs, and a "blue-gray oval patch" on his lower back. Dr. Hwang's assessment of these marks was that "[g]iven the evenness of color of the lesions," bruising, or ecchymoses, was "less likely." Dr. Hwang noted that dermal melanocytosis (Mongolian spots) could appear "as blue or slate gray-macular lesions," that they were most commonly found in the sacral area but could also be found "more extensively over the back," and that they typically took years to fade. Dr. Hwang listed a half a dozen rare conditions that could be associated with such marks. Dr. Hwang also noted that the "reticulated bluish mottling of the skin" on M.D.'s lower extremities was cutis marmorata, that it was "physiologic [a normal condition of the body]," and that no treatment is generally required. Dr. Hwang concluded that there were "no concerning findings" and that the hospital's dermatology department would "sign off on [the] patient."

¶ 45    Dr. Kim also saw and evaluated M.D. and, according to the notes she made in M.D.'s file, agreed with Dr. Hwang's findings. She believed that the marks forming something of a "reticulated netlike pattern on [M.D.'s] mid back," could be "a vascular malformation" similar to what was

13

observed on M.D.'s thighs. (The record contains no photographs of any marks observed on M.D.'s legs.) Noting that her department had no pediatric dermatologist on staff, and "[g]iven the extensive nature of the skin findings," Dr. Kim "highly recommend[ed] outpatient referral to a Pediatric Dermatologist at Lurie Children's [Hospital] upon discharge" to "assess for possible phakomatosis [congenital disorders affecting the skin] or vascular malformations beyond the typical dermal melanosis involving the back."

¶ 46    Dr. Hwang and Dr. Kim were asked to reevaluate M.D. three days later, on May 24, 2019, because, as Dr. Hwang noted, the "primary team noted 'resolution' of back lesions." Dr. Hwang noted that blue-gray patches consistent with dermal melanocytosis (Mongolian spots) were still present on M.D.'s back, and that "[a]dditionally, in the background, there [were] reticulated faint purpulish [*sic*] patches present on the back and extremities which [could] be physiologic." Dr. Kim noted that the "reticulated vascular net-like pattern" seen throughout M.D.'s trunk and extremities was "consistent with physiological cutis marmorata or livedo reticularis, which can be commonly seen in infants." She agreed that the pattern on M.D.'s back seemed "less prominent" than on May 21, but stated that it was "still present albeit fainter" and "[t]here is often fluctuation with temperature." Dr. Kim concluded by stating, "I have not observed any ecchymoses [bruising] today (5/24/2019) or on my initial examination on 5/21/2019." Both Dr. Hwang and Dr. Kim continued to recommend further evaluation by a pediatric dermatologist.

¶ 47    Dr. Torres, however, was satisfied that the lesions on M.D.'s back, forehead, and arm were "consistent with bruising" and were "most likely secondary to inflicted trauma." She based this opinion on "the appearance of the bruising, the pattern of the bruising, the location in relation to his developmental age, and that there has been no accidental mechanism provided that would explain the injuries." She could not quantify the minimal amount of force necessary to cause a

bruise on an infant, but stated that "it would be more than would be expected of the normal handling of a baby." She did not believe an infant of M.D.'s age and size would be capable of self-inflicting a bruise and felt it was "unlikely for a child that's not cruising, in the absence of bleeding disorders, to have bruising."

¶ 48    Dr. Torres was aware of cutis marmorata, a physiologic response that can look like "lacy mottling" and most often presents "in the lower extremities and the trunk." This is "a benign and normal finding," and she agreed that M.D. "did have some mottling like that on his legs." She was able to rule that out as a cause for the marks on his back, however, because "[t]hey did not seem to be temperature dependent, and they just did not have a similar appearance to cutis marmorata." In sum, Dr. Torres was confident the marks on M.D.'s back were bruises and had ruled out an underlying bleeding disorder, use of the Rock 'n Play, and accidental trauma as plausible mechanisms for that bruising.

¶ 49    Dr. Torres was aware of M.D.'s history of poor weight gain but concluded "that the condition was resolving" and "that he was gaining appropriate weight at home during the two appointments prior to being admitted into the hospital." She did note, however, that he "gained excellent weight while inpatient with no additional intervention aside from feeding" and concluded from this that "his previous poor weight gain was secondary to inadequate caloric intake." When asked if he was fed the same type of formula in the hospital as at home, Dr. Torres said, "[a]s far as I know."

¶ 50    On cross-examination, Dr. Torres acknowledged that she was not board-certified in dermatology. She agreed that a computed tomography (CT) scan and skeletal survey had revealed no evidence that M.D. had suffered any fractures or head trauma. She did not believe that just laying an infant on the rings of the Rock 'n Play would cause bruising. But she did not form an

15

opinion on the specific manner in which the bruising was caused or the "specific implement" that may have caused it. When asked if she was able to render her medical opinions in this case "to a level of more likely than not," Dr. Torres said that, yes, she was. When asked if that meant 51% or more, however, Dr. Torres refused to quantify her degree of certainty. She maintained that nonaccidental trauma was the "most likely" diagnosis for M.D.'s bruises. The alternative would be to conclude that the marks were of indeterminate origin, something she would only say if she "was on the fence about it." In this case, however, she felt that nonaccidental trauma was "most likely."

¶ 51    The State rested, and the trial court denied Sha'bora's motion for a directed finding.

¶ 52                              *2. The Mother's Witnesses*

¶ 53                                a. Dr. Mark Serota

¶ 54    Sha'bora called Dr. Mark Serota, a dermatologist who was board certified in pediatrics, allergy, immunology, and dermatology, to testify. Dr. Serota was not separately board certified in pediatric dermatology but believed that his training would satisfy the credentialing necessary for that certification as well. Dr. Serota's pediatric residency at a large children's hospital on Long Island involved rotations in pediatric dermatology and child abuse pediatrics. He had diagnosed child abuse before, both at the hospital on Long Island and at the University of Colorado, where he spent his dermatology residency.

¶ 55    At the time of his testimony, 10% to 20% of Dr. Serota's patients were children. He estimated that he diagnosed child abuse approximately 5 to 10 times a year, either in cases where he himself suspected it or in cases referred to him to evaluate for potential abuse. These evaluations were sometimes conducted in person but often "over a telemedicine type modality where they'll send [him] pictures and give [him] the history of the case." Dr. Serota had been retained as an

expert by both plaintiffs and defendants, was asked to lecture nationally on dermatologic and allergic subjects, and had given presentations on modalities that mimic child abuse and skin conditions that have the same presentation as bruising. Dr. Serota was found qualified, with no objection from the State, as an expert in pediatrics and dermatology.

¶ 56    In this case, he was "asked to review [M.D.'s] medical records and photographs and [to] generate a report regarding the skin markings that were described." He reviewed 912 pages of records from Stroger Hospital, over 100 pages of records from M.D.'s pediatrician, and the photographs taken by Ms. Madrigal on May 21, 2019. In forming his opinions, Dr. Serota also relied in part on the dermatology consultation conducted at Stroger Hospital, which concluded that ecchymosis, or bruising, was less likely than other potential diagnoses. Dr. Serota believed M.D. could have had cutis marmorata or cutis marmorata telangiectatica congenita, conditions that, according to him, "can cause enlargement of the blood vessels and create this circle kind of net-like pattern on the skin of a baby in particular." In Dr. Serota's opinion, the possibility also existed that the marks "were created by an external source," possibly the hard plastic circular rings of the Rock 'n Play, which could form hyperpigmented impressions on the skin while leaving the center area clear. Dr. Serota also considered a hybrid explanation, in which the compression caused by the rings on the Rock 'n Play might have triggered the vascular condition, causing a dilation of the blood vessels in a ring-like pattern.

¶ 57    Dr. Serota acknowledged that when he formed his initial opinions and wrote his report in this case, he had not been given access to a number of additional photographs taken of M.D. at the hospital on May 23, May 24, May 29, and June 6, 2019. When asked how those photographs impacted his opinion, he stated: "I think after seeing these photos, it's more likely that it was an external source that triggered these markings as opposed to an internal physiologic mechanism."

There were some objections and off-the-record discussions, and when the hearing resumed, the State and the public guardian indicated that they did not object to proceeding with Dr. Serota's testimony if he would not be adding any new opinions to his report.

¶ 58    Upon further questioning, Dr. Serota clarified that after reviewing the new photographs, he had ruled out dermal melanocytosis (Mongolian spots). This was never the likely diagnosis, in his view, but he had included it as a possibility because the dermatology consultants at Stroger Hospital had raised it. As to the vascular conditions he had included in his report (cutis marmorata and cutis marmorata telangiectatica congenita), Dr. Serota explained that those are usually caused by "some sort of external trigger"—heat, irritation from the baby crying, or even physical pressure on the skin. Cutis marmorata telangiectatica congenita is essentially "a more fixed pattern of cutis marmorata" that "does not wax and wane." After reviewing the initial photographs Ms. Madrigal took, Dr. Serota believed "that it could have just been a physiologic response." Having seen the additional photographs of M.D. taken at the hospital, Dr. Serota wished to modify his opinion. He explained that "[l]ooking at the photos now, some of the pattern marks on the upper back look very circular in nature with a central clearing, which tells me that they are from an external source, most likely. So I adjusted my opinion to make the physiologic cutis marmorata less likely." Regarding the rings on the Rock 'n Play, Dr. Serota said:

> "Looking at the rings, they seem to be a similar size and shape of these markings on the baby. And you can see that there is a ring of coloration on the photos, and there's a central area of clearing that looks just like normal skin.
>
> So I think that the rings could be playing a role where if the baby was on those rings, that it could create those kind of markings on the back. They seem to line up."

¶ 59    After viewing the new photographs, Dr. Serota still concluded that there was not enough

18

evidence to diagnose nonaccidental trauma. There was "no other objective evidence to suggest nonaccidental trauma in any of the other ancillary tests that would typically be done to rule out nonaccidental trauma on a baby." A CT scan, skeletal survey, and ophthalmologic exam all failed to indicate anything of that nature. Failure to thrive was also something that might be observed in infants but "that [did not] mean that there [was] nonaccidental trauma going on."

¶ 60    On cross-examination, Dr. Serota acknowledged that 80% of his current practice involves adults, only about 5% of the children he sees are infants under the age of one, and only 20% of those infants are under the age of three months. He acknowledged that he was not board-certified in child abuse pediatrics. He was also not aware that on May 23, 2019, Dr. Torres had measured the circular rings on the Rock 'n Play and found them to have a diameter of about four centimeters. He did not recall reading that and was not sure whether he had been provided Dr. Torres's notes. When asked if he would have included that information in his report if it had been known to him, Dr. Serota said "I would think so." Dr. Serota agreed that he had never examined M.D. in person and had never spoken directly with M.D.'s parents, M.D.'s primary care physician Dr. Tewelde, or any of the doctors at Stroger Hospital.

¶ 61    On redirect examination, Dr. Serota testified that one thing that reinforced his opinion that there was no abuse in this case was that the dermatology department at Stroger Hospital, which had been communicating with Dr. Torres, decided not to change its opinion that the marks on M.D.'s back were not signs of abuse. He explained that a trained dermatologist would know "more specifics about the dermatology aspects of a case like this and alternative diagnoses that an abuse specialist would be unfamiliar with." He described an abuse specialist like Dr. Torres as "sort of the general in the field" looking at "the whole picture" but stressed that it was important for someone in that position to "rely on individual specialists for the systems that they are particularly

experts in" and not second-guess the conclusions of those experts.

¶ 62    Dr. Serota testified that the level of parental engagement in this case also played a role in his opinion. He explained that although objective evidence is the most important thing to consider, the parents' behavior "carries some degree of weight." The medical records in this case indicated that M.D.'s parents "seemed appropriately concerned and were presenting [M.D.] to care and following instructions." There was a period of time when they had some trouble getting to appointments, but they were "actively concerned and engaged," were "following recommendations," and were "following up with their doctors." When asked by the court about the fact that Melvin was at times asleep or did not engage in discussions with Dr. Torres at the hospital, Dr. Serota said he did not attach too much significance to that. The record as a whole indicated that the parents were cooperative and engaged.

¶ 63    In sum, Dr. Serota agreed that M.D. had sentinel injuries (visible, poorly explained injuries in young children that raise concerns of abuse) and that if he were M.D.'s pediatrician, he would also have referred M.D. "for a complete workup." The results of that workup, however, did not support a finding of abuse in this case. Dr. Serota explained that "from a pediatrics perspective, I care a lot that I don't want to send a child back to an abuse situation." "But on the flip side of that," he noted, "I also don't want to take away a child from a parent if the evidence isn't very strong."

¶ 64                      b. Stipulated Testimony of Dr. Angela Shannon

¶ 65    The parties stipulated that, if called as a witness, board-certified pediatric gastroenterologist Dr. Angela Shannon would testify that she uses the World Health Organization's measurement benchmarks and that an infant's weight percentile for his or her height over time is a better predictor for failure to thrive than analyzing weight gain or loss on its own. Having reviewed M.D.'s medical records, she would conclude to a reasonable degree of

20

medical certainty, consistent with her written report in this case, that M.D. did not meet the criteria for a failure to thrive diagnosis.

¶ 66                     C. The Trial Court's Initial Adjudicatory Findings

¶ 67    The trial court concluded on August 3, 2021, that M.D. was not abused or neglected as defined in section 2-3 of the Act and dismissed the State's petition for wardship. The judge noted that although he had heard similar cases, "this one seem[ed] to have more speculation than most." He noted that, in the absence of any other injuries suggesting abuse, this had been "a type of battle of the experts" as to the nature and origin of the marks on M.D.'s body. On that point, the court stated:

> "The marks on the child cannot be definitively explained. But I believe that the weight has to go to the dermatologist's testimony as being a specialist. I don't think there was any intentional physical abuse, nor does there have to be proof that there was intent on the part of any sort of abuser.
>
> There just—as [the assistant public defender] pointed out, there are a lot of unanswered questions here, and I still don't think there are sufficient facts to corroborate findings here. There are no fractures. There's no hemorrhaging. Although there was an attempt to try and see whether or not the Rock n Play was the cause of some of these marks it's still not clear what happened.
>
> I just don't feel that there is enough evidence here, and there was not a preponderance of evidence shown to justify findings as to any of the grounds that the State has included in its petition, so I am dismissing the petition at this point."

¶ 68    D. The Public Guardian's Motion to Reconsider and the Court's Revised Findings

¶ 69    Two days later, on August 5, 2021, the public guardian filed an emergency motion asking

the court to reconsider its adjudicatory findings. The public guardian insisted that the court had misapplied the law because "[n]o statute or caselaw requires corroborative injuries" and "unexplained bruising to a two-month-old is sufficient to find physical abuse." The public guardian represented to the court three times in its motion that upon viewing additional photographs of the marks on M.D.'s body taken during the course of his hospital stay, Dr. Serota had *withdrawn* his previous opinion "of cutis marmorata or any other condition consistent with a vascular pattern of changes." The public guardian maintained that the court's decision to dismiss the State's petition for wardship "was based on mistaken conclusions regarding the medical experts' opinions about the cause of [the] ring-like marks" on M.D.'s body. In support of the public guardian's motion, the State likewise represented that Dr. Serota had "discarded" cutis marmorata or any other medical condition as a possible cause of the marks. The State asserted that, "upon reviewing the additional photographs received shortly before his testimony, [Dr. Serota] determined that [M.D.]'s injuries were more likely from an external source and not from any internal physiologic source, *in other words, not from any medical condition.*" (Emphasis added.)

¶ 70    The trial court granted the motion to reconsider. Following a "re-review of the evidence in this case," the judge was persuaded by the public guardian's argument that the unexplained marks on M.D.'s body were in fact bruises and that all medical and nonaccidental causes for those marks had been ruled out. The trial judge stated:

> "The case has caused me great concern. The injuries that I looked at, that were shown to me, the bruises couldn't really be explained. Add to that the age of the child and the fact that the child was not ambulatory heightens my concern and scrutiny. There was no evidence of any sort of accidental cause. Medical causes were ruled out. Accidental causes were ruled out.

There simply was not any plausible explanation for what was shown, what was discovered on the body in terms of the bruises and the injuries. Even the Rock 'n Play did not line up. Failure to thrive was a separate issue. Though I would note there was weight gained when in a more controlled environment overseen by medical personnel."

¶ 71    The judge entered a finding of neglect based on an injurious environment, noting that he "[did] not feel there [was] evidence to go beyond that."

¶ 72                              E. The Dispositional Hearing

¶ 73    At the December 1, 2021, dispositional hearing in this matter, the trial court found that Sha'bora and Melvin, who were no longer living together, were fit and willing but not yet able to care for M.D., made M.D. a ward of the court, and appointed a guardian with the right to place him in foster care. The court granted Sha'bora unsupervised overnight visits and gave DCFS the discretion to institute unsupervised visits with Melvin in the future. M.D., who was by then two years old, was doing well living in his paternal aunt's home, and DCFS recommended a goal of return home within 12 months.

¶ 74                              II. JURISDICTION

¶ 75    The trial court entered its disposition order in this matter on December 1, 2021. That order encompassed the court's earlier finding, made on October 5, 2021, that M.D. was neglected based on an injurious environment. See *In re Barion S.*, 2012 IL App (1st) 113026, ¶ 36 ("In juvenile cases, an adjudicatory order is generally not considered a final appealable order. [Citation.] Rather, the dispositional order is regarded as final and appealable as of right and the proper vehicle to appeal a finding of abuse or neglect."). Melvin timely filed his notice of appeal on December 30, 2021. We have jurisdiction over this appeal pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments in civil cases,

and Illinois Supreme Court Rule 660(b) (eff. Oct. 1, 2001), governing appeals from final judgments in child protection proceedings under the Act.

¶ 76                                    III. ANALYSIS

¶ 77    Melvin appeals from the trial court's order granting the public guardian's motion to reconsider the court's initial adjudicatory finding of no abuse or neglect and entering a finding of neglect due to an injurious environment. "The purpose of a motion to reconsider is to bring to the court's attention newly discovered evidence that was not available at the time of the original hearing, changes in existing law, or errors in the court's application of the law." *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 36. We generally review a trial court's ruling on a motion to reconsider for an abuse of discretion. *Belluomini v. Zaryczny*, 2014 IL App (1st) 122664, ¶ 20. As we have explained, however, under that "rubric" of abuse of discretion, we must apply other standards of review, depending on whether the underlying issue is one of fact or law. *Shulte v. Flowers*, 2013 IL App (4th) 120132, ¶ 24. "[W]here a motion to reconsider only asks the trial court to reevaluate its application of the law to the case as it existed at the time of judgment," for example, that is a legal question, and our standard of review is *de novo*. *Bellumomini*, 2014 IL App (1st) 122664, ¶ 20.

¶ 78    The parties agree that here, the motion to reconsider raised neither a claim of newly discovered evidence nor of a change in the law. The thrust of the motion was that the trial court had misunderstood the expert testimony in this case and should reassess its initial finding that medical and accidental causes for the lesions on M.D.'s body had not been ruled out. Where, as here, "a motion for reconsideration requests the court to change its mind about its factual findings, we will find no abuse of discretion in the granting or denial of the motion unless the court's revised factual findings, or the factual findings to which it decided to adhere, are against the manifest

weight of the evidence." *Schulte*, 2013 IL App (4th) 120132, ¶ 22.

¶ 79    The findings at issue here were made pursuant to the Act, which establishes the procedures by which a minor may be removed from his or her parents and made a ward of the court. The Act contemplates a two-step process. An adjudicatory hearing is first held to determine whether the minor is abused, neglected, or dependent. 705 ILCS 405/1-3(1), 2-21(1) (West 2018). If such a finding is made, the trial court then conducts a dispositional hearing (*In re G.F.H.*, 315 Ill. App. 3d 711, 715 (2000)) to determine whether it is in the minor's best interest to be made a ward of the court and, if so, to hear evidence regarding what disposition will best serve "the health, safety and interests of the minor and the public" (705 ILCS 405/2-22(1) (West 2018)).

¶ 80    Our supreme court has counseled that "[a] proceeding for adjudication of wardship represents a significant intrusion into the sanctity of the family which should not be undertaken lightly." (Internal quotation marks omitted.) *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). If the State fails to prove an allegation of abuse, neglect, or dependance by a preponderance of the evidence—by convincing the court that the allegation is "more probably true than not"—the court must dismiss the petition. *In re A.P.*, 2012 IL 113875, ¶ 17. A finding that the State has met this burden will be reversed only where it is against the manifest weight of the evidence, where "the opposite conclusion is clearly evident" or "the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 81    Here, the trial court initially concluded that the State had failed to prove either abuse or neglect. On reconsideration, however, it entered a finding of neglect due to an injurious environment. Under the Act, a neglected minor includes "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2018). The term "injurious environment" is as "an amorphous concept that cannot be defined with particularity,"

but that "has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotation marks omitted.) *In re A.P.*, 2012 IL 113875, ¶ 22. Cases involving such allegations are *sui generis* and "must be decided on the basis of their unique circumstances." (Internal quotation marks omitted.) *Id.* ¶ 17. In this case, it is clear from the court's ruling on the motion to reconsider that the finding rested on the court's belief that the evidence showed that M.D. had suffered nonaccidental trauma because "[m]edical causes were ruled out" and "[a]ccidental causes were ruled out."

¶ 82    Under the manifest weight standard, we typically defer to the trial court when it acts as a finder of fact because it can better observe the conduct and demeanor of the witnesses. *Best*, 223 Ill. 2d at 350. For the same reason, "[t]he trial judge is in the best position to resolve conflicts in expert testimony and determine their credibility." *In re Z.L.*, 2021 IL 126931, ¶ 82. Here, however, the court made clear that it found Sha'bora's expert to be more credible than the State's expert, stating on the record at the close of the adjudicatory hearing, "I find no fault with the testimony of Dr. Torres. I just found that Dr. Serota was more persuasive in this particular case." The judge explained that this was a battle of the experts. Where the marks on M.D.'s body could not be definitively explained, "the weight [had] to go to the dermatologist's testimony being a specialist." Our review of the record, including a close reading of the testimony offered in this case and the parties' arguments in support of and against the motion to reconsider, convinces us that this reasonable and supported credibility determination was overcome by a persistent mischaracterization of the evidence by both the public guardian and the State, when those parties asked the court to reconsider its ruling.

¶ 83    In its emergency motion to reconsider, the public guardian repeatedly stated that "[a]fter viewing photos of [M.D.'s] bruises and relevant documents from Stroger, Dr. Serota *withdrew* his

previously written opinion of cutis marmorata or any other condition consistent with a vascular pattern of changes as a possible explanation for bruising." (Emphasis added.) The public guardian made this representation in his introduction to the motion, in his summary of Dr. Serota's testimony, and again in his legal analysis. The State joined in this characterization of the doctor's testimony, stating in its own brief that "upon reviewing the additional photographs received shortly before his testimony, [Dr. Serota] determined that [M.D.'s] injuries were more likely from an external source and not from an internal physiologic source, *in other words, not from any medical condition*." (Emphasis added.)

¶ 84    Apparently swayed by this recasting of the expert testimony, the trial court concluded for the first time on reconsideration that "[m]edical causes were ruled out," that "[t]here simply was not any plausible explanation" for the marks on M.D.'s body other than bruising, and that a finding of neglect based on an injurious environment was warranted.

¶ 85    However, the representations made by the public guardian and the State that all medical causes were ruled out simply does not track with the expert testimony given in this case. After reviewing the new photographs, Dr. Serota "ruled out" dermal melanocytosis (Mongolian spots), but he explained that in his view that had never been a very likely diagnosis. A review of the new photographs also prompted him to modify—but not withdraw—his opinion that a vascular condition (cutis marmorata or cutis marmorata telangiectatica congenita) was likely responsible for the marks on M.D.'s body. He initially thought that one or both of those conditions could have arisen as a physiologic response (to heat stimuli, for example). Noting the circular patterns with a central clearing in the additional photographs, however, Dr. Serota acknowledged that the marks were more likely caused by an external source and "adjusted [his] opinion to make physiologic cutis marmorata *less likely*." (Emphasis added.) Dr. Serota did not, as the public guardian and the

27

State repeatedly told the trial court, abandon his theory that the marks were caused by a vascular condition. His opinion was already that a vascular condition could have been triggered by heat or pressure, and he modified that opinion to note that pressure from an external source like the rings on the Rock 'n Play, which he believed could cause a dilation of the blood vessels in a ring-like pattern, was now the more likely trigger.

¶ 86    Although Dr. Serota was not aware that the rings on the Rock 'n Play had been measured and found to be larger than the marks on M.D.'s back, this fact did not, as the State has insisted, "rule out" the Rock 'n Play as having played a role. When Dr. Serota was asked whether any of the new information he had received changed his opinion that the marks on M.D.'s body were more likely than not a result of something other than nonaccidental trauma (*i.e.* abuse), his answer was an unequivocal no. Reiterating that there were no other objective findings to support abuse, that his opinion was consistent with that of the dermatologists at Stroger Hospital, and that the cooperative and engaged nature of the parents in this case was also relevant, Dr. Serota adhered to his conclusion that child abuse was simply not indicated.

¶ 87    From his statements on the record, the trial court judge appears to have initially understood this testimony and found it persuasive. His later statements on the record indicate that he reversed course solely because he was convinced—erroneously—by the public guardian and the State that Dr. Serota had withdrawn, rather than modified, his opinion that a vascular condition could have caused the bruise-like marks on M.D.'s back and that all proposed medical explanations for those marks had therefore been excluded. The court's finding of neglect based on this erroneous conclusion was against the manifest weight of the evidence, and its decision to grant the public guardian's motion to reconsider was thus an abuse of discretion.

¶ 88    There is an additional problem with the court's finding in response to the motion to

reconsider. Even if the evidence did demonstrate that there were unexplained bruises on an infant incapable of locomotion, that would support a finding of abuse, not neglect. The court's finding of neglect based on an injurious environment appears to be a compromise position—a finding the court was more comfortable making where the evidence of abuse was problematically weak. However, if—as appears to us to be the case—the evidence presented simply did not support a finding that M.D. had suffered bruising, then there was no basis for a finding of either abuse or neglect, and the State's petition was properly dismissed.

¶ 89　　There is no reason to address cases relied on by the public guardian for the proposition that unexplained bruises in an infant not capable of self-locomotion are alone sufficient to support a finding of neglect. Before the court in this case was improperly persuaded to abandon its initial findings, it had clearly concluded that the State did *not* prove by a preponderance of the evidence that the marks on M.D.'s body were bruises at all. The public guardian also acknowledges on appeal that the court's finding of neglect was never based on either the parents' decision to continue using the Rock 'n Play sleeper after they learned it had been recalled or on a failure-to-thrive diagnosis. And the public guardian does not argue that either of those circumstances presents an alternative basis on which we should affirm a finding of neglect.

¶ 90　　　　　　　　　　　　　　　IV. CONCLUSION

¶ 91　　For the above reasons, we reverse the trial court's order granting the public guardian's motion to reconsider and reinstate the court's order dismissing the State's petition for wardship.

¶ 92　　Reversed.

29

*In re M.D.*, 2022 IL App (1st) 220017

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-JA-572; the Hon. Demetrios Kottaras, Judge, presiding. |
| **Attorneys for Appellant:** | Marv Raidbard, of Skokie, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham and Gina DiVito, Assistant State's Attorneys, of counsel), for the People.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Mary Brigid Hayes, of counsel), guardian *ad litem*. |