2024 IL App (1st) 240430

FIFTH DIVISION
December 3, 2024

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-24-0430

| | | |
|---|---|---|
| *In re* K.C., D.F., K.F., and K.Y., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 22 JA 00834 |
| | ) | No. 22 JA 00835 |
| v. | ) | No. 22 JA 00836 |
| | ) | No. 22 JA 00837 |
| Shaniqua B. | ) | |
| | ) | Honorable |
| Respondent-Appellant). | ) | Levander Smith, Jr., |
| | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Oden Johnson and Navarro concurred in the judgment and opinion.

**OPINION**

¶ 1    The State petitioned in this case for the respondent Shaniqua B.'s four minor children—

K.C., K.Y., K.F., and D.F.—to be adjudged wards of the court pursuant to section 2-3 of the

Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2022)). Following an adjudication

hearing, the trial court found that the State had met its burden on its allegations that D.F. was

abused under subsections (2)(i) (physical abuse), (2)(ii) (substantial risk of physical injury), and

(2)(v) (excessive corporal punishment) of the Act (*id.* § 2-3(2)(i), (ii), (v)) and that K.C, K.Y., and

K.F. were neglected under section 2-3(1)(b) (injurious environment) of the Act (*id.* § 2-3(1)(b)).

At the dispositional and permanency hearings that followed, the court adjudged D.F. a ward of the

court and established a permanency goal for him of return home within 12 months. It allowed

D.F.'s sisters to remain with their mother, subject to an order of protective supervision.

¶ 2     The children's fathers are not parties to this appeal, and Shaniqua does not challenge the trial court's dispositional findings. She argues on appeal that the State failed to prove each of the allegations of abuse and neglect by a preponderance of the evidence.

¶ 3     For the following reasons, we affirm in part and reverse in part.

¶ 4                                I. BACKGROUND

¶ 5                        A. The State's Petitions for Wardship

¶ 6     On November 10, 2022, the State petitioned for D.F., a male child born on January 5, 2016, and D.F.'s three older sisters, K.C. (born November 22, 2011), K.Y. (born August 22, 2013), and K.F. (born January 5, 2015), to be adjudged wards of the court pursuant to section 2-3 of the Act (*id.* § 2-3). The State alleged that D.F. was neglected based on an injurious environment (*id.* § 2-3(1)(b)) and abused as a result of both excessive corporal punishment and exposure to a substantial risk of physical injury (*id.* § 2-3(2)(ii), (v)). In support of the requested findings, the State alleged the following:

> "On or about October 28, 2022, this minor [D.F.] was observed to have multiple healed linear and loop marks about his upper body as well as a lump on his forehead. This minor reported that mother recently hit him in the head repeatedly with a can and beat him with a cord in the past. This minor also reported that mother withholds food as a form of punishment. Mother admits hitting this minor and this minor's siblings with a belt."

Based on this same recitation, the State alleged that K.C., K.Y., and K.F. were neglected due to an injurious environment (*id.* § 2-3(1)(b)) and abused due to a substantial risk of physical injury (*id.* § 2-3(2)(ii)).

¶ 7     The State amended its petition on November 2, 2023, based on these same facts, to allege

that D.F. was physically abused, pursuant to section 2-3(2)(i) of the Act (*id.* § 2-3(2)(i)).

¶ 8                                    B. The Temporary Custody Hearing

¶ 9     A temporary custody hearing was held via videoconference on November 14, 2022. The State argued there was an immediate and urgent necessity, pursuant to section 2-10 of the Act (*id.* § 2-10) for the minors to be removed from the home and placed into the temporary custody of the Department of Children and Family Services (DCFS) guardianship administrator.

¶ 10    DCFS investigator Tasia Morris testified at the hearing that she was assigned to this case on October 28, 2022, when she was told by school social worker Meghan Princehorn that D.F., who was then six years old, told her that marks observed on his body had been caused by his mother. Ms. Morris spoke with D.F. in person at his school. She observed and photographed a "small lump" over his left eyebrow and "old marks" on his arms, neck, and back. D.F. told her that the marks were caused by his mother hitting him with a cord. He said the knot on his head was from her hitting him with a metal can while he was seated in the front seat of the family's car and his siblings were also present. D.F. said that his mother's boyfriend also hit him. D.F. told Ms. Morris that he did not feel safe at home.

¶ 11    Ms. Morris spoke to D.F.'s sisters at the school that same day and testified as to what they reported to her. K.F., then seven years old, stated that her mother "whooped [her] a little" with a belt, though Ms. Morris did not observe any marks on K.F.'s body. K.F. was present in the car when D.F. was hit, but she did not say that he was hit with a can.

¶ 12    K.Y., then nine years old, did not indicate that she was ever hit. She said that D.F. had been hit on the hand before but did not say with what or where this occurred. She said that the knot on his head was from him falling off a swing at the park.

¶ 13    K.C., then 10 years old, told Ms. Morris that her mother would sometimes punish her by

hitting her with a "Flip Mop," though Ms. Morris did not observe any marks on K.C.'s body. When asked about the knot on D.F.'s head, K.C. said he got it when K.F. pushed him off the bed.

¶ 14    Finally, Ms. Morris spoke to the children's mother. Shaniqua acknowledged that she used "half a belt" on the children as corporal punishment. She explained that the children frequently fought, especially K.F. and D.F., and that K.F. "scratche[d] on [D.F.] a lot." Shaniqua told Ms. Morris that she did not know D.F. had a lump on his head and denied hitting him with a can.

¶ 15    Following these interviews, Ms. Morris and her supervisor determined that D.F.'s injuries were not fresh, but "in the healing stages," and initially referred Shaniqua for the Intact Family Services program. When the file, including the family's prior history with DCFS, was reviewed by an area administrator, however, Ms. Morris was instead told "to screen with the State's Attorney." Ms. Morris testified that DCFS now believed that it was in the best interest of each of the minors to be taken into temporary custody.

¶ 16    On cross-examination, Ms. Morris agreed that none of the girls had any concerns about staying with their mother. Shaniqua had been instructed to take D.F. to the doctor, and Ms. Morris confirmed that she had done so, though she did not know the results of that visit. Ms. Morris agreed that previous DCFS investigations concerning the family had concluded that allegations of abuse or neglect were unfounded.

¶ 17    In an affidavit dated November 7, 2022, detailing DCFS's efforts in the case, Ms. Morris gave a similar account. She averred that when she met with six-year-old D.F. on October 28, 2022, he had "fresh marks on him"—a lump on his head and bruising to his arm—and it was "the second time he ha[d] been observed having concerning injuries." D.F. told Ms. Morris that he had fallen, but she did not find this explanation to be consistent with his injuries. She instead believed that he was "being severely abused at home." Later in her affidavit, Ms. Morris said that the bump on

D.F.'s head "was from Shaniqua hitting him with a heavy, metal can on 10/27 *** about 30 times." D.F. disclosed to her, she stated, that one time when Shaniqua was hitting him, her boyfriend, who resided with the family, had pulled a gun on her "to get her to stop."

¶ 18    Ms. Morris met with D.F.'s siblings the same day, and according to her affidavit, they "did not disclose any information about abuse or neglect." K.F. had a mark on her left arm with a Band-Aid on it that she said was a burn from trying to heat candy in the microwave. Ms. Morris noted that the children had seen Shaniqua's boyfriend hit Shaniqua and had also witnessed their grandmother hitting Shaniqua with a cord or belt.

¶ 19    Ms. Morris stated in her affidavit that Shaniqua had been investigated by DCFS on several prior occasions: in February 2019 for physical injury to K.Y., in June 2019 for physical injury to D.F., in 2021 for physical injury to D.F. and a substantial risk of physical injury to all four of the children, and in March 2022 for physical injury to K.Y. A child protection investigator (CPI) had been instructed to screen the case "due to the high sequence"—and "the marks on the minor." The State explains in its brief on appeal that this was a "Sequence E" investigation because it was the fifth complaint about the family received by DCFS.

¶ 20    The State rested, and Shaniqua's counsel called her to testify. Shaniqua stated that she was born on February 25, 1993, and confirmed that she had a son, D.F., and three daughters, K.C., K.Y., and K.F. She was a single mother and had never received child support from the children's fathers. Shaniqua explained that because she worked first shift as a customer service associate at Bank of America, from 7 a.m. to 2:30 p.m., her boyfriend (ex-boyfriend at the time of the hearing) took the kids to school. Shaniqua said the kids' grades were all "great" and she "[didn't] have any complaints or anything about them." She later testified, however, that she received calls home "every single day" from the school regarding D.F.'s behavior.

¶ 21    Shaniqua testified that she took D.F. to the doctor, as instructed by Ms. Morris, and according to Shaniqua, the doctor said that "everything pretty much look old to her." After observing D.F.'s behavior, the doctor advised Shaniqua to enroll D.F. in outpatient services at Hartgrove Hospital (Hartgrove). Shaniqua explained that she had tried to have D.F. admitted to Hartgrove for a short-term in-patient program, but he did not qualify for it. She declined outpatient services because she did not want him missing school. Shaniqua testified that her support system was "pretty much [her]self."

¶ 22    On cross-examination, Shaniqua explained that the person she referred to as her "friend" or "ex-boyfriend" was "like [her] ex." They were "not really together" but had grown up together, and he helped her with the kids because he knew she "[didn't] really have anybody as kind of like a father to them."

¶ 23    The trial court determined, based on this evidence, that there was probable cause to conclude that the children were abused, neglected, or dependent. It agreed with the State that urgent and immediate necessity existed to remove D.F. from Shaniqua's custody and that visits between the two of them should be restricted to supervised day visits. D.F.'s sisters, however, would remain in their mother's care. The court entered an order of protection under section 2-25 of the Act (*id.* § 2-25) and instructed DCFS to make at least two unannounced visits per month.

¶ 24    The court explained that although the doctor had purportedly opined that the marks on D.F.'s arms, back, and torso were old, that was obviously not true of the lump on D.F.'s head. The court observed that in the photos taken by Ms. Morris there were marks "all over" D.F.'s body and noted that D.F. had expressed that he did not feel safe at home. The court acknowledged that no marks were observed on the girls, that they expressed no concern for their own safety, and that they "only very minimally" corroborated D.F.'s account of what had happened to him. The court

found Ms. Morris's testimony "consistent and credible," but stated that Shaniqua's testimony "was not completely credible." She first said she had no complaints with the children but then said that she received calls from the school about D.F.'s behavior every day. And there was also some discrepancy, the court noted, regarding whether the individual who helped Shaniqua care for the children was her current or ex-boyfriend.

¶ 25                                    C. Interim DCFS Reports

¶ 26    At a hearing on December 9, 2022, regarding the State's efforts to reach and serve the putative fathers of these minors, DCFS caseworker Breanna Woodard also provided the court with an update on the family. Ms. Woodard testified that although D.F. had been placed in foster care with fictive kin and the court had ordered all visits between him and Shaniqua to be supervised, D.F. reported that his mother still picked him up from school and he was still living with her. K.F. had also complained of a toothache at school, which she attributed to Shaniqua throwing a chair at her to get her to stop running around. Ms. Woodard stated that she would make sure the school and the foster parent D.F. was living with knew that Shaniqua's visits with him were to be supervised, and she would go to Shaniqua's home to check on the safety and welfare of the girls.

¶ 27    At what appears to be the next report the court received about the status of the family, on November 16, 2023, DCFS caseworker Lauren Wilson reported that she visited D.F.'s foster home monthly and there was nothing unusual to report. D.F. was in therapy. She also visited the girls at Shaniqua's house monthly but planned to increase the frequency of those visits "[j]ust to make sure the home [was] safe and appropriate for the girls" and "the issues in the home [were] mitigated." Ms. Wilson reported that Shaniqua had "worked on some services" and that she continued to do so, but that there were still some outstanding referrals. Overall, she recommended that the girls remain with their mother.

¶ 28                          D. The Adjudicatory Hearing

¶ 29    An adjudicatory hearing was held on January 19, 2024, and the parties agreed to proceed by stipulation, jointly submitting two pages of stipulated facts. They stipulated to the minors' ages and parentage, as well as to the fact that Shaniqua was their custodial parent at all relevant times. The parties further stipulated that, if called as a witness, Ms. Morris would testify that she was assigned to investigate the hotline call received on October 28, 2022. She met in person with D.F. at his school that same day, where she observed and photographed a "knot" on the left side of his head and " 'scratches' on his upper right and left arms, stomach and back."

¶ 30    According to the stipulation, Ms. Morris also met in person on October 28, 2022, with D.F.'s sisters. The parties stipulated that she would testify the girls were all appropriately dressed, she observed no marks or bruising on their bodies, and they reported they were not scared to go home with their mother.

¶ 31    K.F. told Ms. Morris that she "[got] whooped on her arm and leg with a belt." She denied being hit with a cord or seeing D.F. be hit with a cord. She stated that D.F. "got in trouble in the car," that their mother "hit [D.F.] in the car with her hand," and that D.F. had a scratch on his arm.

¶ 32    K.Y. stated that when D.F. got in trouble after school on October 27, "he was hit in the hand."

¶ 33    K.C. stated that she "[got] whooped sometimes by a flip flop to her hand." She disagreed that her mother withheld food from the children and stated that K.F. had pushed D.F. off the bed.

¶ 34    Ms. Morris then spoke to Shaniqua, who acknowledged that she "whoop[ed] the children with a belt to their behind," explaining that sometimes "the children move" when she is administering that punishment. Shaniqua believed that some of D.F.'s scratches were caused by him fighting with K.F. and K.C.

¶ 35    The parties further stipulated that, if called to testify, D.F. would state that the knot on his head was where his mother had hit him with a metal can because he was bad at school. This happened when he was in the front seat of the car and his sisters were in the back seat. D.F. would also testify that his mother caused the "scratches" on his body with a cord, that she hit both him and his siblings with a cord, and that she only hurt him when he was in trouble. He would testify that his mother also withheld food from him when he was in trouble.

¶ 36    Finally, the parties stipulated to the foundation for five photographs taken by Ms. Morris on October 28, 2022, of D.F.'s left arm, right arm, forehead and left eye, back, and stomach. We have reviewed these photos and note that multiple linear and in some cases loop-shaped marks can be seen in them on D.F.'s arms, back, and torso, as well as a slightly swollen curved red mark above his left eyebrow.

¶ 37    The State drew the court's attention to these photographs in its closing, arguing that they corroborated D.F.'s version of events—that he was struck with an item—and that there were several very clear loop marks, caused by "a belt or a cord that [was] looped." The State maintained that these were "not a typical scratch obtained from a sibling" but rather "pattern mark[s]" that were in various stages of healing. Based on D.F.'s age and the scars left on his body, the State argued it had "certainly proven excessive corporal punishment." And "if you find that these marks are sufficient to rise to the level of physical abuse," the State told the trial court, "we certainly would argue that they could be seen as physical abuse in a minor this young." The State's view was that "it could easily and understandably be noted that [D.F.] would have a psychological ramification from obtaining those type of marks at such a young age from his mother."

¶ 38    The State argued that a finding of neglect should also be made as to D.F.'s sisters. The State pointed out that they had reported being "struck in the home" too and that "this clearly rises

to the level of neglect—at a minimum, neglect injurious environment for the other children." The State explained that it was not also seeking a finding of abuse as to the girls because they were dressed when interviewed by DCFS, and no marks or bruises could be observed on them.

¶ 39    The assistant public guardian agreed with the State's arguments. He pointed out both that in addition to the older marks on D.F.'s body, the photos showed a newer mark—redness around his left eye—and that Shaniqua had admitted "to using belts on the kids."

¶ 40    Shaniqua's counsel argued that the State had failed to meet its burden of proof on any of the allegations of abuse or neglect. He argued that there was "no clear bright line between acceptable, reasonable corporal punishment" and child abuse and insisted that corporal punishment did not become child abuse based on "just the existence of marks." The State had presented no evidence regarding the factors established by the caselaw for making that determination, counsel insisted. He also disagreed with the State that the pictures spoke for themselves, stating "you need to put on evidence to interpret them." D.F.'s own account of what happened was not corroborated by his sisters and was in some cases contradicted by them, counsel also noted. And as to the girls, while there was evidence that they received corporal punishment, there was no evidence that it was excessive.

¶ 41    The trial court found the State had met its burden on the allegations that D.F. was abused under section 2-3(2)(i) (physical abuse), 2-3(2)(ii) (substantial risk of physical injury), and 2-3(2)(v) (excessive corporal punishment) of the Act (*id.* § 2-3(2)(i), (ii), (v)) and that K.C, K.F., and K.Y. were neglected under section 2-3(1)(b) (injurious environment) of the Act (*id.* § 2-3(1)(b)).

¶ 42    The court found the photos of D.F. "very disturbing." The evidence was that Shaniqua hit D.F. only when he was "in trouble," and so that was corporal punishment, the court acknowledged,

10

but it was corporal punishment that, in the court's view, was "excessive to the point that [it was] physical abuse and there [was] a substantial risk of physical injury for [D.F.]." The court said, "The mother needs to know—and I don't know what her mindset was, but it's got to change. There are other forms of discipline for children, but this is not it. This is excessive and it's physical abuse."

¶ 43    The court noted that there was no evidence of marks or bruises on the girls but found that the environment they were in was still injurious because they were "watching their brother—or they're in an environment at all in which their brother is getting this type of treatment— maltreatment, and the girls themselves are also getting whooped." The court stated that it was "not going to sit by and wait for this to escalate. This environment ha[d] to change."

¶ 44                    E. The Dispositional and Permanency Hearings

¶ 45    The court held dispositional and permanency hearings immediately following the adjudicatory hearing. Because Shaniqua does not challenge the court's dispositional findings in this appeal, we do not summarize those proceedings in detail. Several exhibits, including an integrated assessment, service plans, and therapy progress reports, were entered into evidence. The court again heard from Ms. Woodard, who testified regarding the family's prior involvement with DCFS, Shaniqua's participation in referred services, her supervised visits with D.F., and the girls' home environment. And the court also heard again briefly from Shaniqua.

¶ 46    The court concluded that Shaniqua was "fit, able, and willing to care for, protect, train, and discipline" D.F.'s sisters but was "unable for some reason other than financial circumstances alone" to do so for D.F. Reunification services had been successful as to the girls, the court found, and it was not in their best interests to be made wards of the court, but such efforts had been unsuccessful as to D.F., and he was adjudged a ward of the court.

11

¶ 47 The court established a permanency goal for D.F. of return home within 12 months and a permanency goal for K.C., K.Y., and K.F. of remain home.

¶ 48 The court converted the section 2-25 order of protection into an order of protective supervision under section 2-24 of the Act (*id.* § 2-24) that required Shaniqua to, among other things, cooperate with DCFS, attend parenting classes and counseling, and refrain from using or allowing anyone else to use corporal punishment on the minors. DCFS was again ordered to make unannounced visits twice monthly and to monitor the children's grades and school attendance.

¶ 49                                    II. JURISDICTION

¶ 50 The trial court entered dispositional orders with respect to these four minors on January 19, 2024. Those orders encompass the court's adjudicatory findings, made earlier that same day. In this case, the adjudicatory order is not a final or appealable order. Rather, "the dispositional order is regarded as final and appealable as of right and the proper vehicle to appeal a finding of abuse or neglect." *In re Barion S.*, 2012 IL App (1st) 113026, ¶ 36. Shaniqua timely filed her notice of appeal from the dispositional orders on February 16, 2024. We have jurisdiction over this appeal pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments in civil cases, and Illinois Supreme Court Rule 660 (eff. Oct. 1, 2001), governing appeals in cases arising under the Act.

¶ 51                                    III. ANALYSIS

¶ 52 The Act establishes a two-step process by which a minor may be removed from his or her parents and made a ward of the court. *In re M.D.*, 2022 IL App (1st) 220017, ¶ 79. An adjudicatory hearing is first held to determine whether the minor is abused, neglected, or dependent. 705 ILCS 405/1-3(1), 2-21(1) (West 2022). If such a finding is made, the trial court then conducts a dispositional hearing (*In re G.F.H.*, 315 Ill. App. 3d 711, 715 (2000)) to determine whether it is in

12

the minor's best interest to be made a ward of the court and, if so, to hear evidence regarding what disposition will best serve "the health, safety and interests of the minor and the public" (705 ILCS 405/2-22(1) (West 2022)).

¶ 53 Our supreme court has counseled that "[a] proceeding for adjudication of wardship represents a significant intrusion into the sanctity of the family which should not be undertaken lightly." (Internal quotation marks omitted.) *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). A petition for wardship should only be granted if the State proves an allegation of abuse, neglect, or dependance by a preponderance of the evidence—by demonstrating that the allegation is "more probably true than not." *In re A.P.*, 2012 IL 113875, ¶ 17.

¶ 54                                    A. Standard of Review

¶ 55 Here, Shaniqua challenges the trial court's adjudicatory findings that D.F. was abused and that his sisters, K.C., K.Y., and K.F., were neglected due to an injurious environment. We typically reverse a trial court's findings of abuse or neglect only if they are against the manifest weight of the evidence, *i.e.*, where "the opposite conclusion is clearly evident" or "the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006). The parties here ask us to depart from that standard and review the adjudicatory findings in this case *de novo*, on the basis that stipulated evidence, rather than live testimony, was presented at the adjudicatory hearing.

¶ 56 In *In re Zion M.*, 2015 IL App (1st) 151119, cited by both the public guardian (in an argument adopted by the State) and Shaniqua, this court did indeed conclude that adjudicatory findings based on a stipulated record should be reviewed *de novo*. See *In re Angela P.*, 2022 IL App (1st) 211092, ¶¶ 43-45 (following *Zion M.*). But the cases the *Zion M.* court relied on were not child protection cases. The court in *Alderson v. Southern Co.*, 321 Ill. App. 3d 832, 846 (2001),

13

considered a paper record only to determine whether it had personal jurisdiction over the defendant in that case. *De novo* review was proper, it concluded, because "there were no conflicts in the evidence or credibility determinations to resolve" and "the trial court had only a question of law before it." *Id.* The court in *Norskog v. Pfiel*, 197 Ill. 2d 60, 70-71 (2001), considered *de novo* whether the disclosure of mental health information was prohibited by a statutory discovery privilege. In both cases the court decided a relatively straightforward question simply by applying the law to the uncontroverted facts.

¶ 57 Deciding whether a child has been subjected to excessive corporal punishment or physically abused, whether that child is at substantial risk of future physical injury, and whether that child's siblings have been neglected due to their exposure to an injurious environment are far more nuanced and complicated findings. While the parties in a child protection case may arrive at a stipulated factual basis for the trial court's adjudicatory findings, the inferences that can be drawn from such facts will rarely if ever be so straightforward that we should feel comfortable abandoning all deference to the trial court's findings. See *In re D.D.*, 2023 IL App (1st) 230433-U (distinguishing *Zion M.* and *Alderson* and concluding that where different inferences can be drawn from undisputed facts, the manifest-weight-of-the evidence standard should apply).

¶ 58 Although it is true, absent live testimony, that the trial court is in no better position than this court to assess the credibility of witnesses (*Zion M.*, 2015 IL App (1st) 151119, ¶ 28), that is far from the only reason we defer to the trial court's findings, particularly in child protection cases. The trial court judge's experience with such matters generally far outstrips that of this court. As we explained in *In re R.S.*, 382 Ill. App. 3d 453, 459-60 (2008), "wide discretion is vested in the trial judge *to an even greater degree than any ordinary appeal to which the familiar manifest weight principle is applied*" because of "the delicacy and difficulty of child custody cases."

14

(Emphasis added and internal quotation marks omitted.) See *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001) (noting that "[t]he trial court is given broad discretion and great deference in matters involving minors").

¶ 59    To treat the trial court's adjudicatory findings here as if they were made based solely on a two-page written stipulation also ignores the reality of these cases. Although the judge who presides at an adjudicatory hearing will not always have presided over the case since its inception, often, as in this case, the judge shares a history with the family and caseworkers that this court lacks. In such circumstances, a stipulation may serve as a sort of shorthand for live testimony and other evidence that has already been presented to the court. In apparent recognition of this, the public guardian has summarized at length the live testimony presented at the temporary custody hearing in this case and also referenced the testimony from the December 2022 hearing. We have chosen to as well. All of the proceedings in this case provide relevant context for the findings we are asked to review.

¶ 60    Having raised these concerns, we find it unnecessary to definitively resolve the question of the appropriate standard of review in this case. We conclude, for the reasons given below, that the result of this appeal is the same whether we defer to the trial court's factual findings under our usual manifest-weight-of-the-evidence standard or consider the evidence *de novo.*

¶ 61                             B. Proof of Abuse as to D.F.

¶ 62    The trial court concluded that there were three separate bases on which to find that D.F. was abused: (1) excessive corporal punishment under section 2-3(2)(v) of the Act, (2) physical abuse under section 2-3(2)(i), and (3) a substantial risk of physical injury under section 2-3(2)(ii). 705 ILCS 405/2-3(2)(i)-(ii), (v) (West 2022). Each of these requires proof of different elements, and we address each in turn.

¶ 63                                    1. *Excessive Corporal Punishment*

¶ 64    A minor is abused under the Act if his or her "parent or immediate family member \*\*\*
(v) inflicts excessive corporal punishment." *Id.* § 2-3(2)(v). The term "excessive corporal
punishment" is not defined in the Act. *In re J.P.*, 294 Ill. App. 3d 991, 1002 (1998). This is in
keeping with this court's recognition that "cases involving the adjudication of abuse, neglect, and
wardship are *sui generis*; that is, each case must be decided on its own distinct set of facts and
circumstances." *Id.* As we have noted, judges must take care in cases involving corporal
punishment "not to create a legal standard from our personal notions of how best to discipline a
child." *Id.* at 1005. Although "corporal punishment as a method of discipline is a 'controversial
issue,' " parents nevertheless have the right—derived from the constitutional right to privacy—to
use it when raising their children. *Id.* at 1002, 1005. That right, however, must be exercised in a
reasonable manner. *Id.* at 1002.

¶ 65    In *J.P.*, relied on by Shaniqua, this court held that a mother who disciplined her child by
spanking her with a wooden spoon had not employed excessive corporal punishment. *Id.* at
1004-05. Although we did not wish "to give license to parents who would use the force of physical
objects to discipline their children," we concluded in that case that "the mere frequency of
relatively mild, nonbruising contacts by an object other than a hand" did not rise "to the level of
'excessive corporal punishment' " under the Act. *Id.* at 1005-06.

¶ 66    We found instructive a relevant section of the Illinois Administrative Code, which sets out
factors DCFS should consider when determining whether a cut, bruise, welt, abrasion, or oral
injury "constitutes an allegation of harm." (Internal quotation marks omitted.) *Id.* at 1004 (citing
89 Ill. Adm. Code 300.Appendix B (1997)). Those factors include "the child's age, the severity of
the injury, the location of the injury, whether an instrument was used, and the pattern and

16

chronicity of similar incidents of harm to the child." *Id.* Shaniqua insists that the trial court here was required to examine and make specific findings as to each of these factors. We disagree. The factors cited in *J.P.* appear intended to distinguish between "Cuts, Bruises, [and] Welts" that are accidental injuries and injuries caused by intentional conduct. See 89 Ill. Adm. Code 300.Appendix B (2017) (noting that bruises that fade quickly may still be considered serious "if the type of bruise (*e.g.*, fingerprint marks) *suggest*[*s*] *intentionality*" (emphasis added)); *id.* (explaining that although "[*a*]*ccidental* bruises are frequently seen over boney areas such as knees," bruises located "on soft areas such as the stomach are highly suspicious" (emphasis added)). In this case the question is not whether D.F. was subject to intentional corporal punishment—he clearly was—but whether that punishment was excessive.

¶ 67    *J.P.* does clearly hold that not every instance in which a child is punished with an implement and that implement leaves a mark will constitute excessive corporal punishment. But the facts of that case are quite different from those present here. The mother in *J.P.* began, when her child was 2½ years old, to punish the child by spanking her on the buttocks, over her clothes, with a wooden spoon. *J.P.*, 294 Ill. App. 3d at 1004. The trial court determined that this practice had resulted in bruising only once (a "very small" bruise of about 1 to 1½ inches in size), that the mother was "horrified when this occurred," and that she reported it to her ex-husband and babysitter, neither of whom was very concerned at that time. *Id.* at 1004-05. The babysitter had witnessed the mother employ this form of discipline on multiple occasions and reported both that she did not lash out in anger but was patient and calm when doing so and that the child "appeared happy and unaffected after being disciplined." *Id.* at 1005.

¶ 68    The evidence here, by contrast, was that Shaniqua punished six-year-old D.F. by whipping him with a cord or a belt; that he had old and new linear and loop-shaped marks all over his arms,

17

back, and torso; that D.F. reported Shaniqua hitting him in the head with a metal can in front of his siblings; and that he had a raised knot he attributed to that beating above his left eyebrow. The photos of D.F.'s injuries are, as the trial court noted, "disturbing." And D.F. was not "happy and unaffected" by the discipline, but rather told Ms. Morris—according to her testimony at the temporary custody hearing—that he did not feel safe at home.

¶ 69    We agree with the State that this case is more similar to *In re L.M.*, 189 Ill. App. 3d 392 (1989). The father in that case noticed five "whip marks" on his seven-year-old son's back after the boy had been in his mother's care, and the mother admitted whipping him with a belt. *Id.* at 395, 398. The marks were described as being 6 to 10 inches long, going diagonally in different directions, and with pink flesh revealed where the scabs that initially formed had fallen off. *Id.* at 395. The boy told his father that his mother had whipped him with a belt and a stick because he was playing ball in the house. *Id.*

¶ 70    The court in *L.M.* rejected the mother's argument that using a belt to punish one's child cannot be the basis for a finding of child abuse. *Id.* at 398. The court cited other cases in which such conduct had been found to be unreasonable corporal punishment. *Id.* In *People v. Swanson*, 84 Ill. App. 3d 245, 246 (1980), for example, this court found it unreasonable, in the context of a criminal charge of reckless conduct, for a parent to spank a child with a belt, such that blows fell on the back and chest; in *People v. Reynolds*, 91 Ill. App. 3d 683, 686-87 (1980), and *People v. Johnson*, 133 Ill. App. 3d 881, 885 (1985), we found it unreasonable, in the context of a revocation of probation and charges of aggravated battery and cruelty to children, to whip a child with an extension cord; and in *In re D.M.C.*, 107 Ill. App. 3d 902, 905 (1982), we found it unreasonable for a parent to spank a child with a leather belt on his unclothed buttocks. Having reviewed these authorities, the *L.M.* court concluded that the mother's whipping of her son in that case was

"vicious and unreasonable and exceeded the bounds of proper parental force." *L.M.*, 189 Ill. App. 3d at 398. The extent and nature of the marks on D.F.'s body here, indicative of repeated whippings with a cord or belt, are likewise evidence of excessive and unreasonable corporal punishment.

¶ 71　Shaniqua's attempts to distinguish or question *L.M.* are unconvincing. The fact that the trial court used the word "vicious" to describe the corporal punishment in that case does not mean that such a finding is necessary for corporal punishment to be excessive and unreasonable. Certainly not all the cases cited by the *L.M.* court use that word. Shaniqua also points out that there was evidence in *L.M.* regarding how, specifically, the injuries in that case were discovered and how the nonrespondent parent had other suspicions and concerns regarding the child's care. But none of that is relevant to a finding of abuse based on excessive corporal punishment. And while *L.M.* was decided before *J.P.*, *J.P.* in fact cited *L.M.* with seeming approval. *J.P.*, 294 Ill. App. 3d at 1002.

¶ 72　Shaniqua's counsel additionally faults the State for employing the terms "loop marks" or "pattern marks," given that those terms were not used by the parties in their written stipulation and were not formally introduced as terms of art in medicine or child abuse social work. In our view, those terms were used here, by both the State and the trial court, not as terms of art but because they aptly describe the marks that can be seen on D.F.'s body in the stipulated photographs. A "loop" is "a curving or doubling of a line so as to form a closed or partly open curve" (Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/loop (last visited Nov. 22, 2024) [https://perma.cc/BKT4-8GME]), and a "pattern" is a "mechanical design or form," such as "the geometrical *pattern* of [a] carpet" (emphasis in original) (Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/pattern (last visited Nov. 22, 2024) [https://perma.cc/U6TP-VAX7]). These descriptors make clear what is apparent from the

19

photographs: the marks were made with an instrument. And as we have noted, "parents should understand a swat on a child's buttocks with an open hand and the 'paddling' of a child with belts, boards, cords, or ropes are intrinsically distinct exercises of corporal punishment." *In re F.W.*, 261 Ill. App. 3d 894, 902 (1994). "[P]arents using boards, belts, cords, or ropes as weapons to inflict corporal punishment" should expect "an unwillingness on the part of DCFS and the courts to regard their conduct as reasonable." *Id.* at 903.

¶ 73     Whether reviewed *de novo* or under a manifest-weight-of-the-evidence standard, the State proved by a preponderance of the evidence that the corporal punishment here exceeded what was usual, proper, or necessary. It was indeed excessive, and the trial court's finding that D.F. was abused on this basis is affirmed.

¶ 74     Before considering the other bases for the trial court's finding that D.F. was abused, we take a moment to address Shaniqua's argument that the court's findings of physical abuse and substantial risk of physical injury "render [excessive corporal punishment] an effectless surplusage" in the Act. Shaniqua argues that "[t]here would have been no need for the legislature to define excessive corporal punishment as a basis for a finding of abuse if all such factual scenarios were covered by the provisions for physical abuse or abuse due to a substantial risk of physical injury." We agree with the public guardian, however, that corporal punishment can be excessive for reasons other than those that might cause it to rise to the level of physical abuse or a substantial risk of physical injury. It could be excessive in its frequency or in light of the behavior it was intended to address, for example.

¶ 75     Nor are we persuaded by Shaniqua's related argument, articulated most clearly in her reply brief, that corporal punishment as a generally protected activity must be analyzed on its own terms and, though it may be excessive, can never also be considered physical abuse. Each legal theory

of abuse must be assessed on its own criteria, but we see nothing in the Act that limits the trial court to any particular combination of findings where those criteria are met.

¶ 76                                    2. *Physical Abuse*

¶ 77    We move on to the trial court's finding that D.F. was physically abused. Physical abuse is specifically defined, in section 2-3(2)(i) of the Act, as nonaccidental physical injury "which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(i) (West 2022). Not every injury resulting from excessive corporal punishment will rise to this serious level, and we agree with Shaniqua that the State presented no evidence, by stipulation or otherwise, that any of these criteria were met here. Nor did the trial court make any findings in this regard.

¶ 78    The public guardian again directs our attention to the stipulated photographs, insisting that we can conclude from them that D.F. suffered "disfigurement and impairment of physical and emotional health." There is only so much one can conclude from looking at these photos, however. There is no evidence as to harmful effects that D.F. *actually* experienced from any of these injuries. More is needed to support a finding of physical abuse under the statutory definition provided in the Act. The State presented no lay or expert testimony or other relevant evidence demonstrating that the marks in the photos were permanent scars that would be disfiguring to D.F., or that demonstrated how the injuries causing those marks had impaired his health—including his emotional health—or bodily functions.

¶ 79    The parties offer no helpful discussion of cases in which findings of physical abuse were either affirmed or reversed by this court. The public guardian briefly mentions *In re F.S.*, 347 Ill. App. 3d 55, 58 (2004), citing it for the proposition that injuries inflicted by another child in the home can constitute physical abuse. Notably, unrebutted testimony was offered in that case from

21

an expert witness in pediatrics and child abuse regarding the nature and extent of the child's injuries. *Id.* at 60, 65.

¶ 80    Our own research indicates that findings of physical abuse are reserved for situations where these quite stringent statutory criteria are clearly satisfied. See, *e.g.*, *In re D.L.W.*, 226 Ill. App. 3d 805, 811 (1992) (father struck son with a closed fist, kneed him in the groin, struck him with a 1½ -foot-long board, and "threatened to beat him to death unless he learned not to wet the bed"); *In re Brooks*, 63 Ill. App. 3d 328, 334 (1978) (boy's face "was bloody and swollen," he had "a swollen jaw and bruises under his right eye, back, chest and arms," and he stated that his mother had beat him with a cricket bat).

¶ 81    It is important for the State to separately meet its burden of proof for each statutory basis for an adjudicatory finding. Here, under either a *de novo* or manifest-weight-of-the-evidence standard, the evidence was insufficient to find that D.F. was physically abused under the Act's exacting definition. We reverse this finding.

¶ 82                                3. *Substantial Risk of Physical Injury*

¶ 83    Even where physical abuse has not been proven, the evidence may support a finding that a parent has "create[d] a substantial risk of physical injury" to the minor "by other than accidental means which *would be likely to cause* death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." (Emphasis added.) 705 ILCS 405/2-3(2)(ii) (West 2022). Thus, in contrast to a finding of physical abuse, this allegation does not require proof of an actual impairment. We agree with the public guardian that from the photos introduced in this case, "it is reasonable to conclude that the marks on [D.F.'s] head, arms, back and abdomen, could impair his emotional health," and the trial court thus did not err in finding D.F. was abused under this section.

22

¶ 84    Shaniqua argues that the trial court's written ruling insufficiently explained the basis for this finding. She notes the requirement in section 2-21 of the Act that the trial court must explain the basis for any finding of abuse or neglect in writing and insists that the trial court here, like the court in *In re Madison H.*, 215 Ill. 2d 364 (2005), "merely recited statutory words without relying on any fact taken as evidence." We disagree. Our supreme court concluded that the trial court in *Madison H.* failed to comply with section 2-27(1) of the Act, which requires a written factual basis for findings made at a dispositional hearing. 705 ILCS 405/2-27(1) (West 2022). Although an oral finding made on the record could satisfy that requirement, the trial court in that case stated only that it had "concerns" about the respondent's "skills" relative to caring for her children, without elaborating in any way on what those concerns might be. *Madison H.*, 215 Ill. 2d at 377-78.

¶ 85    Here, the trial court succinctly stated the basis for its rulings in the space provided in the form adjudicatory order: "this then 6 year old minor had multiple loop marks on various parts of his body. Mother and this minor state that mother 'whoops' this minor with an instrument." Shaniqua's argument that there was "no developed testimony from anyone about the extent to which any mark in the photos is even an injury, much less how it was caused or how significant it was," ignores the reality of what the photographs clearly show. This six-year-old boy was struck, on more than one occasion, with an object that, if it did not cause permanent scarring, certainly caused lasting and disturbing marks all over his body. It was unnecessary, given the photographs and the reasonable inferences that can be drawn from them, for the trial court to know with precision "the circumstances of any individual mark" or to receive testimony concerning the actual, as opposed to the likely, significance of D.F.'s injuries on his overall health.

¶ 86    The State proved by a preponderance of the evidence, whether reviewed *de novo* or under the manifest-weight-of-the-evidence standard, that Shaniqua created a substantial risk of physical

injury likely to cause "death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function" (705 ILCS 405/2-3(2)(ii) (West 2022)) to D.F. This finding is affirmed.

¶ 87                                    C. Proof of Neglect as to K.C., K.Y., and K.F.

¶ 88    Finally, Shaniqua argues that the State failed to prove by a preponderance of the evidence that K.C., K.Y., and K.F. were neglected due to an injurious environment. "Neglect" is generally viewed as "a failure to exercise the regard that circumstances justly demand." *In re S.D.*, 220 Ill. App. 3d 498, 502 (1991). It "encompasses willful as well as unintentional disregard of parental duties." *Id.* Section 2-3(1)(b) of the Act defines a neglected minor, in part, as one "whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2022). Our supreme court has explained that "the term 'injurious environment' cannot be 'defined with particularity,' " but has noted that "it includes the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." *In re Z.L.*, 2021 IL 126931, ¶ 89 (quoting *Arthur H.*, 212 Ill. 2d at 463). "Each petition alleging an injurious environment is unique, and must be decided according to the circumstances of that case." *In re N.B.*, 191 Ill. 2d 338, 346 (2000).

¶ 89    Shaniqua insists that "[t]he only theory of neglect of the girls was 'anticipatory neglect' based on the findings [of abuse] with respect to D.F." Under the doctrine of anticipatory neglect, " 'the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child.' " *Zion M.*, 2015 IL App (1st) 151119, ¶ 30 (quoting *Arthur H.*, 212 Ill. 2d at 468). The doctrine "recognizes that a parent's treatment of one child is probative of how that parent may treat his or her other children." *Id.* Shaniqua primarily argues that since the State failed to prove D.F. was abused, it also failed to prove the girls were subject to an injurious environment under a

theory of anticipatory neglect. Because we find that the State did prove D.F. was abused, that argument fails.

¶ 90    We also agree with the public guardian that "[i]t is not a purely anticipatory neglect situation where siblings lived in the home at the time of an abused child's injuries and were present when the injuries occurred." We recognized this in *Z.L.*, 2021 IL 126931, ¶ 75, where we distinguished a "purely anticipatory neglect situation" where the minor had not yet been born at the time his or her sibling was abused from situations where, as here, "each of the siblings was born, lived in the home *** at the time of [their sibling's] injuries, and was present when the injuries occurred."

¶ 91    Shaniqua points out that the care and condition of the girls themselves "was fine," that they "were appropriately dressed, bore no marks or bruises," and that they "reported they felt safe with their mother." But in *Brooks*, 63 Ill. App. 3d at 338-40, we rejected the argument that "the abuse of one child cannot support a finding of neglect of a sibling absent evidence of neglect or abuse toward such sibling." And we have repeatedly held that evidence that a child witnessed the abuse of a sibling may be sufficient to support a finding of neglect based on an injurious environment. See, *e.g.*, *In re Gray*, 131 Ill. App. 3d 401, 409 (1985) (affirming the trial court's finding that the environment of three minors was injurious to their welfare based upon the fact that they had witnessed physical abuse against their stepsister); *S.D.*, 220 Ill. App. 3d at 503 (affirming a finding of neglect based on an injurious environment where the minor witnessed the sexual abuse of his sister).

¶ 92    Here, six-year-old D.F. had numerous old and new injuries on his arms, back, and abdomen, as well as a fresh lump on his forehead that he said was the result of his mother hitting him with a metal can while his sisters were present. His sisters all gave different explanations for

25

those injuries. Shaniqua acknowledged that she used corporal punishment on all the children, and the evidence is that, with respect to D.F., the corporal punishment became excessive and put him at risk of physical injury. Whether reviewed *de novo* or under a manifest-weight-of-the-evidence standard, this was sufficient to prove by a preponderance of the evidence that K.C., K.F., and K.Y. were neglected due to an injurious environment.

¶ 93                                    IV. CONCLUSION

¶ 94     For all of the above reasons, we affirm the trial court's findings that D.F. was abused under section 2-3(2)(ii) (substantial risk of physical injury) and 2-3(2)(v) (excessive corporal punishment) of the Act (705 ILCS 405/2-3(2)(ii), (v) (West 2022)) and its finding that K.C, K.F., and K.Y. were neglected under section 2-3(1)(b) (injurious environment) of the Act (*id.* § 2-3(1)(b)). We reverse the court's finding that D.F. was abused under section 2-3(2)(i) (physical abuse) of the Act (*id.* § 2-3(2)(i)).

¶ 95     Affirmed in part and reversed in part.

***In re K.C.*, 2024 IL App (1st) 240430**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 22-JA-00834 through 22-JA-00837; the Hon. Levander Smith Jr., Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Benjamin Ginzky, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham and Gina DiVito, Assistant State's Attorneys, of counsel), for the People.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Mary Brigid Hayes, of counsel), for other appellees. |