2025 IL App (1st) 250254

FIFTH DIVISION
Filing Date November 21, 2025

No. 1-25-0254

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* H.S. and A.S., Minors, | ) | |
| | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | No. 24 JA 677-78 |
| v. | ) | |
| | ) | The Honorable |
| Michael S., | ) | Debjani Desai, |
| | ) | Judge, Presiding. |
| Respondent-Appellant). | ) | |

_____

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Presiding Justice Mitchell and Justice Mikva concurred in the judgment and opinion.

## OPINION

Following adjudicatory and dispositional hearings in the circuit court of Cook County, the circuit court adjudicated the minors, H.S. and A.S., as abused and neglected under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b), (2)(ii) (West 2024)) and found that it was in the minors' best interests that they be made wards of the court and placed in the custody and guardianship of the Department of Children and Family Services (DCFS) (*id.* § 2-27). Respondent

Michael S., the minors' father, appeals the adjudicatory findings that the minors were abused and neglected and the circuit court's admission of hearsay evidence that it subsequently relied on in its ruling. For the following reasons, we affirm.

¶ 1                                    I. BACKGROUND

¶ 2         Respondent is father to H.S, born August 7, 2017, and A.S., born February 14, 2019. The minors' mother is deceased. On September 17, 2024, the State filed a motion for temporary custody and a petition for adjudication of wardship alleging that the minors were abused and neglected: neglected because they were not receiving the care necessary for their well-being pursuant to section 2-3(1)(a) of the Act (*id.* § 2-3(1)(a)) and were in an environment injurious to their welfare pursuant to section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)); and abused because respondent created a substantial risk of physical injury by other than accidental means pursuant to section 2-3(2)(ii) of the Act (*id.* § 2-3(2)(ii)).

¶ 3         In support of the allegations, the State presented the following factual information: on August 21, 2024, respondent was unavailable when the minors arrived home from school. According to police personnel, respondent was later found unresponsive inside the family's home, and Narcan had to be administered to respondent. Suspected illegal substances and drug paraphernalia were also found in the family's home. On September 12, 2024, respondent was again unavailable when the minors arrived home from school. The minors disclosed that they had previously seen drug paraphernalia in the home. Following a hearing on the motion for temporary custody, the circuit court found probable cause and an urgent and immediate necessity to remove the minors from respondent's care and granted temporary custody to DCFS on September 17, 2024.

¶ 4                                   A. The Adjudication Hearing

¶ 5          An adjudication hearing on the State's petition was held on December 3, 2024. The State called the following witnesses: Officer Theodore Yancy, a police officer with Hines Veterans Affairs (VA) hospital; Miguel Sandoval Garcia, the responding DCFS investigator; and Cedrica Fails, the primary DCFS investigator.

¶ 6          Officer Yancy testified that he was dispatched for a well-being check at building 242, apartment 454, of the VA hospital on August 21, 2024. When he arrived, he encountered the property manager, who accompanied him to the apartment. Officer Yancy knocked and banged on the door, announcing his presence, but there was no answer. The property manager subsequently gave Officer Yancy access to the apartment, and upon entering a bedroom, he saw respondent rising from the bed and observed drug paraphernalia on the bed. Officer Yancy testified that he had encountered similar items during his 30 years in law enforcement and recognized them as objects used to inject narcotics and added that narcotics were illegal on VA property. The State asked Officer Yancy whether he said anything to respondent in the bedroom, to which he responded that he explained to respondent why they were there and that the kids did not have a place to go and they were waiting for him when they got off the bus. Officer Yancy also told respondent that he observed drug paraphernalia on the bed when he entered the room.

¶ 7          Respondent objected as to foundation regarding how the officer had knowledge of the minors needing to be let into the home once they got off the bus and to the identification of drug paraphernalia. The circuit court indicated that it would consider the two issues separately before stating that there was sufficient foundation for the officer's observation regarding the drug paraphernalia and further directed the State to ask more specific questions regarding the

alleged drug paraphernalia. Upon further questioning by the State, Officer Yancy explained that he saw two glass tubes that were burnt at one end containing a white powdery substance with an orangish metallic material inside. He also testified that he observed a metal cannabis grinder, shavings he identified as cannabis, and an item he described as like a bong with a white residue on it, which was burnt also. Additionally, Officer Yancy stated that the room had a strong odor of cannabis. The court overruled respondent's objection and found that the State laid sufficient foundation for the drug paraphernalia.

¶ 8      The circuit court then directed the State to build a foundation for the conversation Officer Yancy had with respondent. The State asked Officer Yancy what he was told about the minors on August 21, 2024, and he responded that he was told by the property manager that the minors got off the bus and respondent was not present to meet them at the bus nor were they able to get into their residence. As Officer Yancy started to describe how he saw the minors when he arrived, respondent objected to hearsay because the witness did not have personal knowledge of the conversation nor was he a party to the conversation. The State responded that the officer was a party to that conversation; those were comments that were made to him, and the information was not offered for the truth of the matter asserted but rather led to Officer Yancy's actions on the day in question; this testimony was in response to the request for foundation as to why Officer Yancy appeared at the apartment complex. The circuit court agreed and overruled the objection based on what provided Officer Yancy with information during the course of his investigation. Officer Yancy then testified that he issued respondent a citation for the possession of marijuana on federal property and placed him in custody.

¶ 9      On cross-examination by the public guardian, Officer Yancy testified that he saw the minors outside the residence standing next to the property manager, who made statements to

him in reference to them not being able to get in the house because respondent was not answering the door. Officer Yancy stated that he did not speak with either of the minors and that neither of them had a key to enter the residence, which he knew because they were unable to produce a key. Respondent objected on the basis that the testimony was too cumulative or showed a lack of personal knowledge because the officer stated that he did not have a conversation with the minors so he would not know whether they had a key. The public guardian responded that the minors were outside the residence and the officer gained access from the property manager and not the minors. The circuit court overruled the objection because the question was whether the minors produced a key and indicated that it believed the officer could testify as to whether either minor produced a key; even though they did not have a conversation, he could answer whether the minors produced a key. The public guardian then asked Officer Yancy if the minors produced a key, and the officer replied "no."

¶ 10 On cross-examination by respondent, Officer Yancy stated that he never saw the minors inside the apartment and respondent was alone during their interaction. Officer Yancy never saw respondent use drugs or heard respondent make a statement about drug use, and the alleged drugs were never tested.

¶ 11 Investigator Garcia testified that he was a child protection investigator assigned to investigate a hotline call for two allegations on August 21, 2024—inadequate supervision and substantial risk of physical injury/environment injurious to health and welfare by neglect. Respondent and the minors were present for his investigation at the family residence. Garcia advised respondent of DCFS procedure and his rights during the investigation; respondent indicated that he was familiar because someone had reported him twice in the past. The State questioned whether Garcia asked respondent if illegal drugs were found in the apartment, and

Garcia responded yes; he reviewed the report with respondent and explained that, according to the report, drug paraphernalia and pills were observed on the bed and the pills were confiscated. Respondent indicated to him that the pills were vitamins and not drugs. Respondent objected to hearsay because the witness was referencing a report and, alternately, asked the court to strike the testimony based on a lack of personal knowledge. The State responded that the investigator was testifying as to what respondent told him during their interview on the evening of August 21, 2024, regarding the incident that occurred earlier that day. The circuit court overruled the objection to what Garcia investigated and allowed the testimony not for the truth of the matter asserted but directed the State to separate the conversation from the course of the investigation.

¶ 12    Garcia resumed his testimony and stated that respondent admitted to smoking marijuana but that he did not use any other drugs and never in front of the minors. Respondent, however, declined to take an oral toxicology test. Following the investigative meeting, Garca testified that the agency recommended imposing an out of home safety plan on the family, which he discussed with respondent. During that conversation, respondent identified a neighbor, Karen, with whom he was comfortable placing the minors. Garcia explained to respondent that the safety plan required that all contact between respondent and the minors be supervised by Karen; both Karen and respondent were present and signed off on the safety plan.

¶ 13    On cross-examination by respondent's attorney, Garcia testified that the minors never reported any abuse or neglect to him and he did not see any physical signs of abuse or neglect. The minors were appropriately clothed; the apartment had working utilities, and there was an appropriate amount of food in the home. Garcia stated that respondent told him that he only used marijuana and that the safety plan did not include any provisions related to drug use.

¶ 14    Investigator Fails, the primary DCFS investigator for the case, testified to her understanding of the safety plan created during the previous staffing[1] with Garcia and his supervisor. On August 22, 2024, Fails received updated information about the status of the safety plan and learned that the minors were placed with Karen due to respondent not being available for them; there was some drug paraphernalia in the home, and respondent was unresponsive and did not know what day or time it was. On that day, Fails was assigned to investigate a report of a violation of the safety plan that had been implemented for the minors. Fails subsequently went to the minors' school to follow up on the report. Respondent objected on the basis of lack of personal knowledge and hearsay because Fails was not part of the initial investigation. The circuit court overruled the objection as to Fails's actions regarding the course of the investigation and not for the truth of the matter asserted. The State then asked Fails if, during the course of her work on the investigation, the safety plan was disrupted, and she responded yes. Fails testified that respondent said that he was unaware of the initial safety plan in place, that he was not fully clear about the safety plan, and that he took the minors from Karen. Fails stated that respondent went to Karen's house that morning and demanded the minors from her, stating that he needed to get them ready for school.

¶ 15    Fails interviewed both minors later in the day on August 22, 2024. H.S. told her that respondent and Karen argued before respondent took them home to get ready for school. In response to Fails's questions about corporal punishment, H.S. told her that respondent used a paddle with tape wrapped around it to discipline them. Fails also interviewed A.S., who also

---

[1] The term "staffing(s)" is not defined in the record and appears to be a term of art particular to DCFS cases.

stated that respondent used a paddle to discipline them. Based on her preliminary interviews with the minors, Fails recommended forensic interviews of the minors.

¶ 16     Fails testified that the agency held a staffing to address the disruption of the safety plan and they decided to recreate the safety plan and thoroughly explain the parameters to respondent while also offering him intact family services. The new safety plan replaced Karen with Ashley, respondent's niece, as the care provider and allowed Ashley to stay at the family's apartment while the agency established intact family services. Fails explained the new safety plan to respondent on August 22, 2024.

¶ 17     On August 26, 2024, the minors participated in forensic interviews, which Fails observed. H.S. stated that he was not allowed to play with respondent's "fire toys" and respondent used the toys in the home or car and used fire to light them and smoke came out of them. H.S. said that he was burned by one of the glass pipes on one occasion, and Fails observed burns and bruising on his arm. H.S. also stated that he prepared dinner for himself and A.S. because respondent was asleep most of the time. A.S. drew a picture during his interview, describing it as what respondent used to smoke out of. A.S. stated that he was not allowed to touch respondent's glass toys and things in the kitchen, in the bedroom, on the bed, under the bed, or in the bathroom. He also stated that respondent used a knife to cut up things in the bathroom.

¶ 18     Following the forensic interviews, another staffing was held, and the agency recommended that the minors remain in the second safety plan until respondent was accepted into intact family services. Respondent was offered substance abuse and mental health services through the DCFS intact family services program, and the safety plan with Ashley was to remain in place until respondent received those services.

¶ 19    On September 12, 2024, Fails learned that there was a hotline call concerning the family. Without objection, Fails testified that the hotline call alleged that the minors were dropped off by the school bus and that respondent was not present to get them. The minors were then taken back to the school. The agency subsequently held a new staffing with Fails and her supervisor; the agency determined that the minors would be taken into protective custody based on the previous reports of respondent being unavailable for the minors. Respondent objected to hearsay because Fails referenced reports and she was not the sole investigator on or a part of the investigation for that report. The State responded that Fails testified that she took over the investigation and attended multiple agency staffings; her testimony was what the agency's recommendations were given the information they had gathered to that point.

¶ 20    In response, respondent stated that, if the agency were used as a "pillar of oh, there's so many people in the room" or "it's just from a different person," then any hearsay could get in and argued that, unless it was based on the personal knowledge of the witness, it was hearsay. The State responded that the information was not offered for the truth but as it led to the further action of the agency; Fails was stating the reasons that the agency took the action that it did and that the court could place whatever weight it wanted to on those reasons based on the testimony being offered at the hearing. The circuit court overruled the objection, finding that Fails was a part of the agency, she was the investigator, and it was her actions that led to the decision that she was part of. The court allowed Fails to testify to the recommendation at that point.

¶ 21    Fails further testified that, because respondent had previous investigations regarding the same allegations of being unavailable for the minors when they returned from school, DCFS offered intact family services and had several safety plans for the minors because, instead of

them going to different homes, the agency wanted them to be somewhere steady and in a good environment. After the forensic interviews, DCFS gave respondent a chance to be involved in intact family services. Respondent's objection that the testimony was a narrative was overruled by the court. Fails continued that the agency also offered respondent intact family services for substance abuse and mental health but that another report came in and the agency decided to remove the minors due to respondent being unavailable again. Fails testified about an in-person meeting with respondent on September 16, 2024, at 12:54 p.m. that was originally scheduled for 9 a.m. but respondent said he was late because he was asleep. The minors had already been taken into protective custody. Fails asked respondent to take an oral toxicology test, and he agreed. Respondent was very combative during the meeting and Fails was unable to speak with him about the case at that time due to his disruptive behavior. Fails's supervisor attempted to intervene but ultimately had to terminate the meeting and asked respondent to leave the office. Without objection, Fails testified that the drug test came back positive for cocaine and marijuana. Fails then stated that she took protective custody of the minors because the agency's attempts to address the concerns that brought the case to DCFS attention with safety plans and intact family services were unsuccessful.

¶ 22    The circuit court interrupted Fails's testimony to address respondent, who was smoking during the hearing,[2] and asked him to refrain from doing so.

¶ 23    On cross-examination, Fails described burns and bruises on H.S.'s arm, which the minor described as accidental. H.S. told Fails that he tried to jump on his father and burned himself

---

[2]The hearing took place via Zoom.

on the pipe his father was smoking. Fails also admitted on cross-examination that she never visited respondent's apartment.

¶ 24    After hearing argument, the circuit court ruled that the State had met its burden by a preponderance of the evidence that the minors were abused or neglected under the Act and made findings of neglect—injurious environment, neglect—lack of necessary care, and abuse—substantial risk of physical injury. In making those findings, the circuit court found that Officer Yancy testified very clearly and credibly with 30 years of experience that he responded to a well-being check and that the minors were unable to gain access to their home. In his testimony, the officer noted that the minors were with the property manager when he arrived because they were unable to get into their home; the officer testified to seeing drug paraphernalia, specifically a white substance, pipes, a bong that was burned at one end, cannabis shavings, and a cannabis grinder, and he smelled the odor of cannabis.

¶ 25    The circuit court also found that the DCFS workers' testimonies were clear and credible that respondent had two opportunities to comply with an agreed-upon safety plan but both were disrupted due to his noncompliance. The court noted that respondent violated the agreed-upon safety plans that were necessary to keep the minors safe from the observed drug paraphernalia, safe from potential drug use issues of respondent, and safe from being unable to gain access to their home, when respondent was not around to retrieve them. The court acknowledged that there was no evidence that the minors knew what drugs were and they did not testify to anything concerning drugs, nor was it reported that they did, other than observe drug paraphernalia. The circuit court then added that both minors also reported corporal punishment and, despite there being no testimony about the extent other than that respondent used a paddle for corporal punishment, it was concerning. The court also expressed concern that the minors

had to prepare their own meals using a stove and that respondent's oral swab was positive for cocaine and marijuana, which corroborated the officer's and investigators' testimony.

¶ 26                                    B. The Dispositional Hearing

¶ 27        The dispositional hearing was held on January 13, 2025, and the circuit court found that respondent was unable to care for the minors and made them wards of the court under the guardianship of DCFS.

¶ 28        Respondent filed his notice of appeal on February 10, 2025.

¶ 29                                           II. ANALYSIS

¶ 30        On appeal, respondent contends that (1) the circuit court erred in allowing hearsay testimony under the "course of the investigation" exception in several instances when it ultimately relied on the truth of that testimony in its ruling and (2) the circuit court's finding that the children were abused or neglected was against the manifest weight of the evidence and should be reversed.

¶ 31                                           A. Timeliness

¶ 32        Before discussing the arguments respondent raises in his appeal, we address the timeliness of our decision. This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Pursuant to Rule 311(a)(5), we are required to issue our decision within 150 days after the filing of the notice of appeal, except for good cause shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Petitioner's notice of appeal was filed on February 10, 2025, making the deadline to issue our decision July 10, 2025. However, respondent filed two motions for extension of time before ultimately filing his appellant brief on May 30, 2025. Thereafter, the state's attorney requested two extensions to file its brief, and the public guardian also filed two motions for extension to file its brief. Accordingly, we revised the

briefing schedule pursuant to those unopposed requests. The state's attorney's brief was ultimately filed on July 23, 2025, and the public guardian's brief was ultimately filed on August 8, 2025. We therefore find good cause for issuing our decision after the 150-day deadline. We now turn our attention to the merits of petitioner's issues on appeal.

¶ 33                                B. Proceedings Under the Juvenile Court Act

¶ 34         In proceedings under the Act (705 ILCS 405/1-1 *et seq.* (West 2024)), the paramount consideration is the best interests of the child. *In re K.F.*, 2023 IL App (1st) 220816, ¶ 35. Cases involving allegations of neglect and adjudication of wardship are *sui generis* and must be decided on the basis of their unique circumstances. *Id.*

¶ 35         Under the Act, the circuit court uses a two-step process to determine whether a minor should be removed from parental custody and made a ward of the court. *Id.* ¶ 36. The first step is the adjudicatory hearing, at which the circuit court shall first consider only whether the minor is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West 2024). The only question to be resolved at an adjudication hearing is whether a child is neglected and not whether every parent is neglectful. *K.F.*, 2023 IL App (1st) 220816, ¶ 36. At the adjudicatory hearing, it is the State's burden to prove allegations of abuse or neglect by a preponderance of the evidence. *Id.*

¶ 36         If such a finding is made, the circuit court then conducts a dispositional hearing to determine whether it is in the minor's best interest to be made a ward of the court and, if so, to hear evidence regarding what disposition will best serve the " 'health, safety and interests of the minor and the public.' " *In re K.C.*, 2024 IL App (1st) 240430, ¶ 52 (quoting 705 ILCS 405/2-22(1) (West 2022)).

¶ 37    In this case, respondent's arguments are directed to the findings of neglect at the adjudicatory hearing. Section 2-3(1) of the Act defines the circumstances under which a minor can be found "neglected." 705 ILCS 405/2-3(1) (West 2024). Here, the circuit court found the minors neglected pursuant to section 2-3(1)(b) of the Act, under which "neglected" persons include "any minor under 18 years of age *** whose environment is injurious to [his or her] welfare." *Id.* § 2-3(1)(b).

¶ 38                    C. Admission of "Course of Investigation" Testimony

¶ 39                            1. Admissibility of Evidence

¶ 40    We first examine respondent's first contention that the circuit court erroneously allowed hearsay testimony under the "course of investigation" exception to hearsay when it subsequently relied on the truth of that testimony in its ruling. Respondent maintains that the circuit court focused on three factors in its ruling that were all established using hearsay. Specifically, respondent contends that the circuit court relied on evidence that the minors were unable to gain access to the home or that respondent was unavailable to the minors, that alleged drug paraphernalia and drugs were in the apartment, and that respondent "disrupted" DCFS safety plans. He contends that, without the hearsay testimony, there was little foundation for those findings.

¶ 41    Generally, whether evidence is admissible is within the discretion of the circuit court, and its ruling will not be reversed absent an abuse of that discretion. *In re J.C.*, 2012 IL App (4th) 110861, ¶ 18. The rules of evidence applicable to civil proceedings apply to adjudication hearings. 705 ILCS 405/2-18(1) (West 2024); *In re J.T.*, 2024 IL App (1st) 232041, ¶ 52. Under the Illinois Rules of Evidence, hearsay is defined as a statement, other than one made by the declarant while testifying, offered into evidence to prove the truth of the matter asserted.

Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay is generally inadmissible unless a specific exception applies because there is no opportunity to cross-examine the declarant. *J.T.*, 2024 IL App (1st) 232041, ¶ 52.

¶ 42 However, testimony about an out-of-court statement that is used for a purpose other than to prove the truth of the matter asserted in the statement is not hearsay. *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 35. The rules of evidence apply to adjudicatory hearings. 705 ILCS 405/2-18(1) (West 2024). However, an out-of-court statement from a nontestifying witness that is not offered to prove the truth of the matter asserted does not constitute hearsay. *J.T.*, 2024 IL App (1st) 232041, ¶ 52. Statements offered only to show their effect on a listener or to explain the listener's subsequent course of conduct are not considered hearsay. *Id.*

¶ 43 Moreover, although hearsay may be admitted at the dispositional hearing, it is inadmissible at the adjudicatory hearing unless it falls under an exception under the Act. *In re G.V.*, 2018 IL App (3d) 180272, ¶ 28. We review *de novo* whether something qualifies as hearsay. *Id.*

¶ 44 Here, respondent contends that several of the circuit court's evidentiary rulings on hearsay objections as well as other unchallenged statements provided the only factual evidence at the adjudication hearing for the minors' abuse and neglect findings. Respondent contends that, without all of the inadmissible hearsay, there was scant evidence to support the circuit court's findings of abuse and neglect and this court should reverse and remand. We disagree.

¶ 45 The record reveals that respondent's counsel raised five hearsay objections during the testimony of each of the State's witnesses that were overruled by the trial court, and for the reasons below, we find that the challenged statements were not hearsay and the trial court did not abuse its discretion in allowing the testimony.

¶ 46        The first two hearsay objections were raised during Officer Yancy's testimony when he testified about his interaction with the minors and respondent on August 21, 2024. Respondent objected to Officer Yancy's testimony that he was told that, when the minors got off the bus, respondent was not available to meet them and they were unable to get into the residence on the basis of lack of personal knowledge of this conversation and, alternately, that Officer Yancy was not a party to the conversation. The circuit court agreed with the State that Yancy was a party to the conversation because the statements were made to him and led to his actions that day. Respondent also objected to Officer Yancy's testimony that neither minor had a key to enter the residence, arguing that it was too cumulative or, alternately, lack of personal knowledge because the officer previously stated that he did not have a conversation with the minors. The circuit court overruled it because the question was whether the minors produced a key and Yancy could testify to that.

¶ 47        We find that there was no error in admitting Officer Yancy's testimony because, examining the complained-of testimony in context, it did not constitute hearsay. This testimony was clearly admitted only to explain Officer Yancy's course of conduct related to the well-being check at respondent's residence after he responded to the property manager's call involving the minors, including how he gained access to the residence. Therefore, we reject respondent's hearsay arguments.

¶ 48        Respondent then raised a hearsay objection to Investigator Garcia's testimony regarding whether he asked respondent whether illegal drugs were found in the apartment based on allegations contained in a report because the witness referenced a report. The witness also testified to statements made by respondent in response to questions about those allegations. The circuit court overruled the objection to what Garcia investigated because he was the initial

DCFS investigator assigned to the case and allowed the testimony to establish why there was an investigation at all. The court then directed the State to separate its questioning concerning the conversation from the course of the investigation. Again, we find no error in admitting Garcia's testimony that he met with respondent in reference to a report received regarding the events on August 21, 2024. Viewing the statements in context, this testimony only served to explain how Garcia came into contact with this family and the course of his investigation. Information received by DCFS may be admitted to show why an investigation began even if insufficient to prove the truth of the allegations. See *J.T.*, 2024 IL App (1st) 232041, ¶ 52; *G.V.*, 2018 IL App (3d) 180272, ¶ 29.

¶ 49    Garcia's testimony further establishes that, as part of his investigation, Garcia interviewed respondent about the contents of the report and, based on that interview, the agency made recommendations for the family. Again, viewing this testimony in the context of the hearing as a whole, we find that it was not hearsay but rather was presented to establish how DCFS became involved with the family and to show the course of the investigation and the steps that Garcia took based on that involvement. It is clear that the testimony was not offered for the truth of the matter asserted; this is established by the fact that Garcia's initial recommendations did not include substance abuse services for respondent. We therefore reject his hearsay allegations as to Garcia's testimony.

¶ 50    Respondent also challenges portions of Fails's testimony as hearsay. Two objections were made at the adjudication hearing during Fails's testimony that were overruled by the circuit court. First, Fails testified regarding the safety plan that Garcia and his supervisor established for the family, and respondent objected based on her lack of personal knowledge and hearsay because Fails was not part of the initial investigation. The court overruled the objection to the

- 17 -

testimony as course of investigation evidence and not for truth of the matter asserted. We find that the trial court correctly allowed this testimony; Fails explained that she was not the initial investigator and so she reviewed the safety plan before she began working with the family. Accordingly, Fails's reference to the safety plan was offered to explain her subsequent conduct, not to prove the underlying allegations, and there was no error in its admission.

¶ 51 Next, respondent objected to another part of Fails's testimony where she referenced reports that she was not the sole investigator on or for part of those reports. For clarification, Fails testified about a subsequent staffing meeting by the agency after another hotline call had been received that respondent failed to meet the children after school again, at which time the agency decided to take protective custody of the minors based on this incident and the previously documented incidents. We again find this testimony was presented not for the truth of the matter asserted but rather to show the agency's course of conduct in taking protective custody of the children. Accordingly, we reject respondent's hearsay challenges to this testimony.

¶ 52 2. Ineffective Assistance of Counsel

¶ 53 In addition to taking issue with the testimony that he objected to during the hearing, respondent also challenges the admission of the oral drug screen results, as an improper lay opinion, and the improper admission of testimony regarding the alleged drug paraphernalia in respondent's home by Fails. Respondent acknowledges that these errors were not objected to during the hearing but contends that this court should review them for ineffective assistance of counsel, because they were the most important piece of the State's weak case. He further contends that the errors were not harmless, as they were not cumulative of other properly admitted evidence.

¶ 54        We do note that respondent has also challenged the ultimate findings of the adjudication hearing, which we will discuss further below. We begin our discussion with first determining whether we can review the unpreserved contentions of error.

¶ 55        It is well established that, to preserve an error for review, a party must, even in child custody cases, object at the hearing and file a written postjudgment motion addressing it. *In re Chance H.*, 2019 IL App (1st) 180053, ¶ 45. Where a party fails to make an appropriate objection in the court below, he or she has failed to preserve the issue for review, and the issue is forfeited. *Id.* Here, respondent acknowledges that his counsel did not object to this testimony, and the record reveals that no posthearing motion was filed. Respondent is therefore raising this issue for the first time on appeal, and it is forfeited.

¶ 56        Respondent does not request that we review this unpreserved issue of admissibility of evidence under the plain error doctrine, which allows us to review forfeited claims. Instead, respondent only makes a claim of ineffective assistance of counsel. Accordingly, we review this claim under ineffective assistance of counsel.

¶ 57        The sixth amendment right to counsel implies the right to effective assistance. *In re Br. M.*, 2021 IL 125969, ¶ 42. The right to counsel has been codified and extended to the parents of a minor who are party respondents in proceedings under the Act. *In re R.G.*, 165 Ill. App. 3d 112, 127 (1988). Although the statutory right to counsel in proceedings under the Act does not have constitutional footing, that right is closely linked to its constitutional counterpart. *Br. M.*, 2021 IL 125969, ¶ 42. As such, our standard of review for evaluating ineffective assistance of counsel claims in criminal cases is the two-prong test in *Strickland v. Washington*, 466 U.S. 668 (1984). *Br. M.*, 2021 IL 125969, ¶ 43. Under the *Strickland* test, respondent must show that his counsel's representation fell below an objective standard of reasonableness and that

there is a reasonable probability that the result of the hearing would have been different had there not been ineffective assistance of counsel. *R.G.*, 165 Ill. App. 3d at 127-28. Counsel's conduct is presumed to be the product of sound trial strategy, and respondent bears the burden of overcoming this presumption. *Charles W.*, 2014 IL App (1st) 131281, ¶ 32. Respondent must satisfy both prongs of the *Strickland* test to prevail on a claim of ineffective assistance of counsel. *Id.* ¶ 33. However, if the ineffectiveness claim can be disposed of because respondent did not suffer sufficient prejudice, a court need not consider whether counsel's performance was deficient. *Id.*

¶ 58    Here, respondent argues that counsel was ineffective for failing to object to the admission of Fails's testimony related to the alleged drug paraphernalia in the residence or her testimony about the results of the oral toxicology test as inadmissible hearsay. He claims he was prejudiced because, if taken at face value, the results tended to corroborate the State's theory that respondent used hard drugs. Respondent argues that the error was not harmless because it was noncumulative evidence.

¶ 59    We have already addressed the issue of Fails's testimony regarding information contained in previous reports above as evidence introduced to establish the course of her investigation in the agency's ultimate decision to take protective custody of the children. Indeed, reading the record in context rather than taking the comment in isolation as respondent does in his brief, it is clear that Fails's testimony concerning the presence of alleged drug paraphernalia was contained in the initial hotline report, which again explained how the case came to the attention of DCFS, as well as why DCFS ultimately decided to take protective custody of the minors. Such testimony was thus admissible, and counsel's failure to object to this testimony was not ineffective, as it would have been another meritless objection. See *id.* ¶ 42.

¶ 60    Regarding the admission of Fails's testimony that respondent's oral toxicology test was positive for marijuana and cocaine, we find that respondent has failed to show sufficient prejudice. As will be discussed in further detail below, contrary to respondent's assertions on appeal, the evidence presented at the adjudication hearing did not solely comprise "hearsay" evidence, and the test result testimony was cumulative to other evidence presented of respondent's drug use, which will be discussed in detail below. Briefly stated, in addition to the drug test results, other evidence presented at the hearing included Officer Yancy's testimony, which described what he saw in respondent's home and his arrest of respondent for illegal drug possession on VA property. The evidence also included Fails's testimony about her interviews with the minors and their forensic interviews, her multiple interactions with respondent, and Fails's certified affidavit documenting DCFS efforts regarding the family. All of this evidence was before the circuit court when it made its rulings at the conclusion of the adjudication hearing. The witnesses' testimonies are considered in their entirety and not simply the isolated instances that respondent relies on to support his arguments. See *In re J.R.*, 2022 IL App (1st) 221109, ¶ 53 (adjudications of abuse and neglect must be reviewed based on the totality of the evidence). Based on our review of the record as a whole, we cannot say that respondent has met his burden of showing that there is a reasonable probability that the outcome of the adjudication hearing would have been different if the testimony concerning the oral drug test results was excluded. We thus conclude that respondent's counsel was not ineffective for failing to object to this testimony.

¶ 61                              D. Abuse or Neglect Finding

¶ 62    Finally, respondent contends that the circuit court's finding that the children were abused or neglected was against the manifest weight of the evidence and should be reversed because

(1) the court improperly relied on the uncorroborated statements of the children to find that they were abused or neglected, (2) the court gave improper weight to respondent's use of corporal punishment as discipline when finding that the children were abused and neglected, and (3) the mere presence of drug paraphernalia in the home and the alleged observation of respondent's drug use did not provide a substantial basis for the court's findings.

¶ 63     Our supreme court has stated that " '[a] proceeding for adjudication of wardship represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *K.C.*, 2024 IL App (1st) 240430, ¶ 53 (quoting *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004)). A petition for wardship should only be granted if the State proves the allegations of abuse, neglect, or dependance by a preponderance of the evidence—by demonstrating that the allegation is more probably true than not. *J.R.*, 2022 IL App (1st) 221109, ¶ 36. Additionally, the same evidence that supports findings of abuse can also support findings of neglect. *Id.*

¶ 64     The reviewing court is deferential toward the circuit court's findings of fact because the circuit court is in the best position to observe the conduct and demeanor of the parties and witnesses, assess their credibility, and weigh the evidence. *Id.* ¶ 37. We typically reverse a circuit court's findings of abuse or neglect only if they are against the manifest weight of the evidence, *i.e.*, where the opposite conclusion is clearly evident or the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *K.C.*, 2024 IL App (1st) 240430, ¶ 55. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *J.R.*, 2022 IL App (1st) 221109, ¶ 37.

¶ 65     In the case at bar, respondent disputes the circuit court's findings of abuse based on a substantial risk of injury, neglect based on an injurious environment, and neglect based on a lack of necessary care. Section 2-21(2) of the Act provides that, if the court determines that the

minor is either abused or neglected or dependent, then a dispositional hearing shall be held to determine whether it is in the best interest of the minor to be adjudged a ward of the court. 705 ILCS 405/2-21(2) (West 2024). As such, the court need only make one of those findings to proceed to a dispositional hearing. *J.R.*, 2022 IL App (1st) 221109, ¶ 39.

¶ 66　　　A neglected minor includes any minor under 18 years of age whose environment is injurious to his or her welfare. 705 ILCS 405/2-3(1)(b) (West 2024). Neglect is defined as the failure to exercise the care that circumstances justly demand (*In re M.D.*, 2021 IL App (1st) 210595, ¶ 24) and encompasses both willful and unintentional disregard of parental duty (*In re A.P.*, 2012 IL 113875, ¶ 22). Similarly, the term "injurious environment" has been recognized as an amorphous concept that cannot be defined with particularity but includes the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children. *M.D.*, 2021 IL App (1st) 210595, ¶ 24.

¶ 67　　　An abused minor under section 2-3(2)(ii) of the Act includes one whose parent or other person responsible for his welfare "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2024). Actual injury is not required; it is sufficient if there is a substantial risk of physical injury. *In re A.S.*, 2020 IL App (1st) 200560, ¶ 35. The same allegations supporting the finding of neglect due to injurious environment can also support the finding of abuse due to substantial risk of physical injury. *J.R.*, 2022 IL App (1st) 221109, ¶ 57.

¶ 68　　　As noted above, adjudications of abuse and neglect must be reviewed based on the totality of the evidence. *Id.* ¶ 53.

¶ 69        Turning to the merits of respondent's appeal, we find that the circuit court's determination that the minors were neglected and abused was not against the manifest weight of the evidence. The State alleged that the minors were neglected based on an injurious environment and a lack of necessary care and abused based on a substantial risk of injury. At the time of the events that began the DCFS involvement with this family, H.S. was seven years old, and A.S. was five years old.

¶ 70        Officer Yancy testified that, on August 21, 2024, he was dispatched for a well-being check at the family's home after respondent failed to meet them at the bus and the minors were unable to gain access to their home. The minors did not produce a key to the apartment, and Officer Yancy gained access from the property manager. After entering the apartment, Officer Yancy eventually found respondent in bed asleep, and he had difficulty waking respondent. Officer Yancy saw two glass tubes on the bed that were burnt at one end; one contained a white powdery substance with an orangish metallic material inside. Officer Yancy also saw a metal cannabis grinder, cannabis shavings, and a bong with a white residue on it that was also burnt. Officer Yancy also stated that he smelled a strong cannabis odor in the room. Officer Yancy further testified that he had encountered similar items during his 30-year career in law enforcement and recognized the items as objects used to ingest narcotics. He also stated that narcotics are illegal on VA property and respondent was issued a ticket and placed in custody for the possession of marijuana.

¶ 71        A hotline call was made to DCFS, and Investigator Garcia was assigned to investigate allegations of inadequate supervision and substantial risk of physical injury/injurious environment to the minors' health and welfare by neglect. Garcia interviewed respondent at the family home with the minors present. Respondent was advised of DCFS procedure and his

rights during the investigation, and respondent indicated that he was familiar, as someone had previously reported him twice. Garcia reviewed the report with respondent, including the allegations of illegal drugs being found in the apartment and confiscated. According to Garcia, respondent stated that the pills were vitamins and that he smoked marijuana but he did not use any other drugs and never in front of the minors. This testimony was contradicted by information gleaned from Investigator Fails's interviews with the minors, who both mentioned respondent's "fire toys," which he used fire to light and which emitted smoke. Garcia instituted a safety plan for the minors with respondent's neighbor, Karen.

¶ 72    However, Fails received an update from the minors' school the following day that respondent violated the safety plan. Fails interviewed the minors at school and learned from H.S. that respondent and Karen argued and respondent took them home to get ready for school. Both minors told Fails that respondent used a paddle to discipline them. Based on this information, Fails recommended forensic interviews for both minors. A new safety plan was created with a relative staying in the home to assist respondent with the minors.

¶ 73    On August 26, 2024, forensic interviews of the minors were conducted and observed by Fails. H.S. spoke about respondent's fire toys and said that respondent used them in the house and the car and also that he was burned by one of the glass pipes accidentally. Fails testified that she saw burns and bruising on H.S.'s arm. H.S. stated that he prepared dinner for himself and A.S. because respondent was asleep most of the time. During his interview, A.S. drew a picture of what respondent smoked with and stated that he was not allowed to touch respondent's glass toys or things in the kitchen, bedroom, and bathroom. He also stated that respondent used a knife to cut things up in the bathroom.

¶ 74        Following the forensic interviews, DCFS kept the boys in the second safety plan and offered services to respondent including substance abuse services. On September 12, 2024, Fails learned that a hotline call had come in regarding the family because respondent did not meet the bus and the children were taken back to the school. At that point, DCFS determined that the minors would be taken into protective custody. A few days later, on September 16, 2024, respondent was almost four hours late to a scheduled in-person meeting with Fails, stating that he was late because he was asleep. It was at this meeting that Fails asked respondent to take an oral drug test and he consented. The oral drug tests results were positive for cocaine and marijuana. During this meeting, Fails was unable to discuss the case with respondent because he was combative and disruptive; ultimately her supervisor asked respondent to leave the office. Fails testified that DCFS ultimately took protective custody of the minors because the agency's attempts to address the concerns that brought the case to DCFS's attention with safety plans and intact family services were unsuccessful.

¶ 75        Based on the totality of the evidence presented at the adjudication hearing, we find that the State proved that the minors were neglected and abused by a preponderance of the evidence. A trial court is allowed to draw reasonable inferences from the evidence. *In re D.F.*, 201 Ill. 2d 476, 499 (2002); *In re J.C.*, 2025 IL App (2d) 240741-U, ¶ 49. The State's evidence established that respondent had issues with substance abuse to the point that he was often unresponsive and unable to care for the minors as evidenced by multiple occasions where he was unavailable to meet them at the bus after school and they were unable to enter the residence. Seven-year-old H.S. was responsible for preparing meals because respondent was often asleep. Officer Yancy had difficulty waking respondent when he entered the residence on August 21, 2024. It can be inferred from the evidence presented that both minors had

observed respondent using drugs and H.S. had injuries related to being burned by one of respondent's pipes. Additionally, by his own admission, respondent had previously been reported to DCFS, and further, he consented to a drug test that yielded positive results for marijuana and cocaine. The State's evidence was unrebutted and more than sufficient to sustain its burden. We conclude that the circuit court's neglect and abuse findings were not against the manifest weight of the evidence.

¶ 76                                    III. CONCLUSION

¶ 77        For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 78        Affirmed.

---

**_In re H.S._, 2025 IL App (1st) 250254**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 24-JA-677, 24-JA-678; the Hon. Debjani Desai, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Samuel M. Hayman, Christina Danielson, and Elizabeth Morgan, Assistant Public Defenders, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Gina DiVito, and Ashlee Cuza, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Christopher J. Williams, of counsel), for other appellees. |

---